Filed 6/24/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SUSAN E. HARRIS, | H041795 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 1-14-CH005881) |
| v. | |
| CHRISTOPHER STAMPOLIS, | |
| Defendant and Appellant. | |

Respondent Susan E. Harris is the principal at Peterson Middle School (Peterson), which is part of the Santa Clara Unified School District. Appellant Christopher Stampolis, a board member of the school district, has a son who attends Peterson. In October 2014, Harris obtained a civil harassment restraining order (Code Civ. Proc., § 527.6)[1] against Stampolis after he became aggressive toward her when she confronted him about how he was regularly late to pick up his son after school. Stampolis appeals the restraining order, arguing that it is not supported by sufficient evidence. For the reasons set forth below, we affirm.

**BACKGROUND**

1. *The Section 527.6 Petition*

Harris is the principal at Peterson, which is part of the Santa Clara Unified School District. Stampolis is a board member of the school district and has a son who attends Peterson.

---

[1] Unspecified statutory references are to the Code of Civil Procedure.

On September 24, 2014, Harris filed a petition under section 527.6 seeking a restraining order against Stampolis. Harris alleged that Stampolis had become belligerent and aggressive toward her after she attempted to speak to him about a school policy that required that all students be picked up no later than 20 minutes after school ended. In violation of this school policy, Stampolis had been regularly late to pick up his son. Harris supported her restraining order petition by attaching documents that detailed the interactions she had with Stampolis that made her fear for her safety.

2. *The Contested Hearing*

The court held a contested hearing on the restraining order on October 14, 2014. During the hearing, multiple witnesses, including Harris and Stampolis, testified.

a. **Background Events**

Harris testified that she had a tense history with Stampolis. Previously, one of the teachers who taught Stampolis's son had complained to her about Stampolis's behavior. Responding to the teacher's complaint, Harris had e-mailed Stampolis, informing him that the teacher had felt harassed by him. Stampolis became upset, interpreting Harris's e-mail to mean that she was going to lodge a legal claim of harassment against him. Harris explained to Stampolis that she used the term "harassment" in her e-mail to describe how the teacher had said she felt after interacting with Stampolis. Despite this clarification, the matter was escalated to the district level and Harris was told that Stampolis had requested that she formally apologize to him. Harris said that she did not formally apologize to Stampolis and was unaware if the district had apologized to him on her behalf.

Stanley Rose, the superintendent of the Santa Clara Unified School District, confirmed that Harris and Stampolis previously had a contentious e-mail exchange. Rose acknowledged that he sent Stampolis a letter apologizing on behalf of the district for Harris's use of the term "harassment" in her e-mail.

2

Stampolis acknowledged that he had previously exchanged e-mails with Harris. However, he believed the situation had been resolved after he received the apology letter from Rose.

b. **The August 27, 2014 Incident**

i. *Harris's Testimony*

Stampolis had been regularly late to pick up his son after school when the school year started. This was in violation of a school policy that required that all students be picked up at least 20 minutes after school ended.

On August 27, 2014, Stampolis came to Peterson to pick up his son. Seeing Stampolis enter the campus, Harris went to speak to him about the school policy. Before she approached Stampolis, Harris asked Andy Masur, the school's vice principal, to accompany her. Stampolis was initially dismissive and preoccupied with his cell phone when Harris spoke to him. Later, he became aggressive and angry. Stampolis raised his voice and began yelling at Harris. He also put his fingers in Harris's face and clasped his hands together in the shape of a gun, pointing his fingers toward her. Harris described Stampolis as standing right in front of her, so close that she could feel his breath on her face. Stampolis walked away from Harris and toward her several times. Harris raised her hands at one point because she thought that Stampolis was going to hit her. Stampolis told Harris that she was harassing him and that she needed to put any of her requests down in writing.

Harris called the district office after Stampolis left. She documented the incident and filed a disruption report. Harris also called a police officer, Officer Fekete, to view a surveillance video that had captured the incident. After watching the video, Fekete told Harris that "this guy [Stampolis] is not safe."

Afterwards, Stampolis filed a harassment claim against Harris, which was later independently investigated and dismissed.

3

ii.    *Masur's Testimony*

Masur confirmed that he was with Harris when she spoke to Stampolis on August 27, 2014.  Initially, Harris spoke to Stampolis in a calm manner.  However, Stampolis became angry and agitated.  He raised his voice and made hand gestures, pointing his fingers and raising his fists.  Masur was afraid that Stampolis would become physical with Harris.

iii.    *Officer Fekete's Testimony*

Officer Fekete confirmed that he watched the surveillance video of the August 27, 2014 incident upon Harris's request.  Fekete observed that Stampolis appeared to be making gestures in the video, and was upset and aggressive.  Based on the footage, he believed that Harris legitimately feared for her safety.

iv.    *Stampolis's Testimony*

Stampolis acknowledged that he spoke with Harris and Masur that day.  Stampolis explained that he had previously spoken to the school librarian, and she had told him that it was perfectly fine for his son to stay after school and study at the library.  That day, he was walking to the school library to pick up his son.

Harris, accompanied by Masur, approached him as he walked onto the campus.  Harris told him that she wanted to speak to him about his son's safety.  Stampolis thought that the subject of the conversation sounded serious; therefore, he believed that Harris should put whatever she was going to say to him down in writing.  Stampolis began walking away from Harris, but Harris called out to him several times so he engaged with her several times.  Stampolis denied making hand gestures toward Harris that resembled pointing a gun.  According to Stampolis, he only gestured toward Harris in a manner that was meant to indicate that Harris should put everything down in writing.

4

v.     *Surveillance Video*

A surveillance video of the incident was introduced into evidence.  Due to the angle of the camera, the video was unable to capture everything that transpired.  Only Stampolis is shown; Harris and Masur are off-screen.  Stampolis is seen pacing back and forth, gesturing with his hands several times.  On video, it appears that Stampolis clasped his hands together, with one hand almost in a fist and the other hand outstretched with his fingers pointing.

c.  **The August 28, 2014 Incident**

i.     *Harris's Testimony*

On August 28, 2014, Harris showed Officer Fekete video footage of the incident from the previous day.  Fekete had just finished reviewing the video when Stampolis came to the school to pick up his son.  Fekete went outside to speak to Stampolis about the school policy regarding student pickups.  At first, Stampolis listened to Fekete.  Shortly after, Stampolis told Fekete that he was not going to listen anymore and entered the school office.  Harris followed Stampolis and Fekete into the school office, where they continued their discussion.  Eventually, Harris told Stampolis that she was not going to give him a visitor's pass to enter the campus.  During their exchange, Stampolis referred to Harris by her first name.  Harris requested that Stampolis refer to her as "Mrs. Harris," because they were in a professional setting.  Stampolis refused and at one point Harris thought that Stampolis was going to physically come after her.  Harris feared for her safety.

ii.     *Officer Fekete's Testimony*

Officer Fekete confirmed that he met Stampolis outside of the school.  He spoke to Stampolis about the school policy regarding student pickups, but he did not believe that Stampolis respected his authority as a police officer.  Fekete accompanied Stampolis to the school office, where Harris was inside.  Fekete observed that Stampolis was

5

constantly looking at Harris during their conversation. He made several movements that made Fekete think that he was going to try to come after Harris. Out of concern, Fekete moved himself between Harris and Stampolis. Fekete believed that Harris legitimately feared for her safety and that Stampolis posed a threat.

### iii. *Stampolis's Testimony*

Stampolis remembered speaking to Officer Fekete and recalled that Fekete spoke to him about the school policy regarding student pickups. After speaking with Fekete, Stampolis went into the school office. Harris was present in the office when he went inside. Stampolis denied lurching or lunging toward Harris in any way. Fekete told him that he was no longer permitted to go beyond the office and onto the school campus.

### iv. *Surveillance Video*

A video of the incident that occurred on August 28, 2014, was shown to the court. On the video, Stampolis is seen interacting with Officer Fekete. Stampolis is leaning against a counter, and Harris, who is almost entirely out of the frame of the video, is at the other end of the counter. Officer Fekete is standing between Stampolis and Harris. Several times, Stampolis stops leaning and stands straight up. Stampolis's back is turned toward the camera during parts of the video.

### d. **The September 2, 2014 Incident**

### i. *Harris's Testimony*

Stampolis was late to pick up his son again on September 2, 2014. He went to the school office and received a visitor's pass from another employee. After noticing that Stampolis had a visitor's pass, Harris went up to him, told him that he was no longer allowed on campus, and asked him to return the visitor's pass. Stampolis told Harris to put everything down in writing. Harris said that she felt nervous around him.

6

ii.  *Officer Fekete's Testimony*

Officer Fekete was present when Stampolis came to pick up his son that day. Fekete described Stampolis as upset but reserved and compliant with the request to return the visitor's pass.

iii.  *Surveillance Video*

A video of the incident that occurred on September 2, 2014, was introduced as evidence and shown to the court. In the video, Stampolis is seen obtaining a visitor's pass from an employee at the school's main administrative office. After he obtains the pass, Harris intercepts Stampolis and it appears that they have a discussion. Stampolis approaches a counter in the office and continues to have a conversation with someone who is off the screen. It is unclear who Stampolis is speaking to, but he eventually leaves the office.

e. **The September 4 and September 19, 2014 Incidents**

i.  *Harris's Testimony*

On September 4, 2014, Stampolis was late to pick up his son again. Stampolis requested a visitor's pass from Harris's secretary, which was denied. Harris was not present during the incident, because she was talking to an investigator about the harassment complaint that Stampolis had filed against her. A disruption claim was filed with the district that day.

On September 19, 2014, Stampolis came to the school office and questioned Harris about her credibility as a principal. He claimed that she was unequally distributing visitor's passes. Harris described Stampolis as being argumentative with her, but he did not raise his voice. Harris said that there were other individuals in the office at the time.

7

### f. **The September 23, 2014 Incident**

#### i. *Harris's Testimony*

As the principal of the middle school, Harris had the authority to issue a 14-day stay-away order against Stampolis. She had not exercised this authority before, because she felt threatened by Stampolis and he had already lodged a claim of harassment against her.

On September 23, 2014, Brian Allen, who was hired by the district to provide Harris with security, was present at the school during the student pick-up time. Harris had shown Allen the video footage of the previous interactions she had with Stampolis, and Allen told Harris that he would issue the 14-day stay-away order against Stampolis on her behalf. That day, Stampolis was late to pick up his son from school again. Stampolis went into the school office, where Allen was waiting for him. Harris was inside her office at the time, but she heard Allen introduce himself to Stampolis. Afterwards, she heard voices being raised. Stampolis told Allen that he wanted to record the conversation, but Allen responded that Stampolis did not have permission to record him. At one point, Harris thought that Stampolis took Allen's photograph.

Harris became concerned for Allen's safety, so she came out of her office, ready to call the police. Harris saw Allen give Stampolis the 14-day stay-away order. Stampolis asked Allen when the order was created. Eventually, Stampolis was asked to leave. Although Stampolis left the school office he remained outside in his car with his son for approximately five minutes. Allen called the police to report the incident and to let them know that Stampolis had been given the 14-day stay-away order.

Later, Harris learned that Stampolis reported to the police that she had falsely imprisoned his son. Stampolis also lodged an appeal with the district over the 14-day stay-away order.

## ii. *Allen's Testimony*

Harris had briefed Allen about the situation with Stampolis. Allen, who had been a police officer for 29 years before working at the school district, became concerned when he saw an image of Stampolis taken from the surveillance video of the August 27, 2014 incident. Allen believed the image showed Stampolis gesturing to Harris with his hands mimicking the shape of a gun. Allen explained that the 14-day stay-away order had been prepared ahead of time as a contingency in case his conversation with Stampolis did not go as planned.

Allen met with Stampolis when he came to the campus that day. Stampolis became agitated and told Allen that he wanted to videotape their conversation. Allen told Stampolis that he did not have permission to do so. At that point, in order to prevent the situation from escalating, Allen gave Stampolis the 14-day stay-away order.

## iii. *Stampolis's Testimony*

Stampolis recalled what happened the day that he received the 14-day stay-away order from Allen. He remembered pulling up to the school and seeing his son being led into the office by Allen. At the time, Stampolis was on the phone. He ended his phone conversation and entered the office when his son did not come out after a few minutes.

Stampolis said that when he entered the office, Allen told him that he needed to speak to him about picking up his son from school. Stampolis thought his son was being wrongfully detained, because when he saw his son earlier it was clear that he wanted to go home. Stampolis was not sure if Harris was in the office at the time, because he talked directly with Allen that day. Stampolis wanted to record his conversation with Allen, but Allen told him that he did not have permission to do so. Afterwards, Allen gave Stampolis the 14-day stay-away order.

Stampolis immediately appealed from the stay-away order with the school district. His son also filed a complaint with the district. Stampolis explained that his son requested that they go file a complaint with the police, so they went to the police station.

### iv. *Officer Fekete's Testimony*

Officer Fekete took Stampolis's statement regarding the false imprisonment claim at the police station. Fekete determined that the claim was unfounded.

### g. **Impact on Harris**

Harris testified that the situation with Stampolis was impacting her health. On September 22, 2014, she went to the emergency room and was diagnosed with acute anxiety. Harris also went to her family physician that same day, who concurred with the diagnosis of anxiety.

Harris explained that she was afraid of Stampolis because of his reputation. Harris was aware that a former student had accused Stampolis of following him in his car at high speeds, Stampolis had previously threatened Superintendent Rose and his wife, Stampolis had threatened a parent who disagreed with him about his conduct at school site meetings, and Stampolis had allegedly struck a storage clerk in Los Angeles. The teachers and staff at Peterson had signed a petition protesting their unsafe work environment, which was spurred by Stampolis's behavior.

## 3. *The Trial Court's Ruling*

Following the hearing, the trial court issued its ruling on the injunction. The court determined, by clear and convincing evidence, that Stampolis had made a credible threat of violence toward Harris on August 27, 2014, by charging at her, making hand gestures, and pointing at her. The court further found that the incidents that occurred on August 27, 2014, August 28, 2014, and September 2, 2014, were also harassment and constituted a course of conduct that seriously alarmed and annoyed Harris. The court

10

determined that Harris had suffered substantial emotional distress as a result of Stampolis's actions.

The court thereafter determined that it was appropriate to forbid Stampolis from being within a certain distance from the school. However, he could be permitted to be at the school's pick-up or drop-off location. Stampolis would be able to attend publicly noticed school board meetings. The injunction was to last for a year, expiring on October 16, 2015.

**DISCUSSION**

1. *Mootness*

Before we address the merits of Stampolis's substantive arguments on appeal, we first examine whether the appeal is moot. The restraining order that is the subject of this appeal expired on October 16, 2015. " 'If relief granted by the trial court is temporal, and if the relief granted expires before an appeal can be heard, then an appeal by the adverse party is moot.' " (*City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1079.)

In a supplemental letter brief, Stampolis argues that the appeal is not moot, because Harris renewed the restraining order prior to its expiration.[2] A trial court has the discretion to renew a restraining order under section 527.6, subdivision (j). "[A] restraining order should be renewed only when the trial court finds a reasonable probability that the defendant's wrongful acts would be repeated in the future." (*Cooper v. Bettinger* (2015) 242 Cal.App.4th 77, 90.) "At the point where a protected party seeks a renewal of a restraining order and the restrained party has either failed to appeal . . . or has lost on appeal, the restrained party cannot challenge the findings and evidence

_____

[2] The renewal is not a part of the record on appeal. Further, neither party mentioned the renewal of the restraining order in their briefs, even though the respondent's brief and reply brief were filed after the original restraining order expired on October 16, 2015.

11

underlying that original order nor the validity of that order." (*Id*. at p. 92.)  The renewed restraining order is set to expire on September 30, 2018.[3]

Because the restraining order has since been renewed, we agree with Stampolis that the appeal is not moot.  A determination that insufficient evidence supports the trial court's finding that Stampolis harassed Harris could provide Stampolis with effective relief.  Such a finding could undermine the basis for the renewal of the restraining order.

Additionally, even if the appeal was moot we would exercise our discretion to consider the claims on the merits.  " '[T]here are three discretionary exceptions to the rules regarding mootness:  (1) when the case presents an issue of broad public interest that is likely to recur [citation]; (2) when there may be a recurrence of the controversy between the parties [citation]; and (3) when a material question remains for the court's determination [citation].' " (*Environmental Charter High School v. Centinela Valley Union High School Dist*. (2004) 122 Cal.App.4th 139, 144.)  Given the renewal of the restraining order, it seems likely that the controversy will recur between the parties. Accordingly, we address the merits of Stampolis's claims.

2. *The Restraining Order*

a. **Overview of Civil Harassment Injunctions and the Standard of Review**

Section 527.6, subdivision (a)(1) provides that "[a] person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order and an order after hearing prohibiting harassment as provided in this section." Section 527.6, subdivision (d) provides that a temporary restraining order may issue, with or without notice, based on the petitioner's declaration if the court finds it is reasonable

---

[3] On our own motion, we take judicial notice of the trial court's order renewing the restraining order, attached to Harris's supplemental letter brief.  (Evid. Code, §§ 452, 459.)

proof of harassment of the petitioner by the respondent, and that great or irreparable harm may result to the petitioner if the restraining order is not issued.

Within 21 days, or if good cause appears, within 25 days, from the date of the petition for a temporary restraining order is granted or denied, the court shall hold a hearing on the petition. (§ 527.6, subd. (g).) At the hearing, the judge "shall receive any testimony that is relevant, and may make an independent inquiry. If the judge finds by clear and convincing evidence that unlawful harassment exists, an order shall issue prohibiting the harassment." (*Id.*, subd. (i).) An injunction restraining future conduct is only authorized when it appears that harassment is likely to recur in the future. (*Russell v. Douvan* (2003) 112 Cal.App.4th 399, 402-403 (*Russell*).)

Section 527.6, subdivision (b)(3) defines "harassment" as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner."

"Credible threat of violence" is defined as "a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (§ 527.6, subd. (b)(2).)

"Course of conduct" is defined as a "pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, facsimile, or computer

13

email.  Constitutionally protected activity is not included within the meaning of 'course of conduct.' "  (§ 527.6, subd. (b)(1).)

"Unlawful violence" is defined as "any assault or battery, or stalking as prohibited in Section 646.9 of the Penal Code, but shall not include lawful acts of self-defense or defense of others."  (§ 527.6, subd. (b)(7).)

We review the trial court's decision to grant the restraining order for substantial evidence.  (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762.)  "The appropriate test on appeal is whether the findings (express and implied) that support the trial court's entry of the restraining order are justified by substantial evidence in the record.  [Citation.]  But whether the facts, when construed most favorably in [petitioner's] favor, are legally sufficient to constitute civil harassment under section 527.6, and whether the restraining order passes constitutional muster, are questions of law subject to de novo review."  (*R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188, fn. omitted.)

b. **Sufficient Evidence Supports the Court's Finding of a Credible Threat of Violence**

Following the contested hearing, the trial court concluded that Stampolis had made a credible threat of violence (§ 527.6, subd. (b)(2)) toward Harris on August 27, 2014. We conclude that sufficient evidence supports this determination.

Based on Harris's testimony, Stampolis did not make an express verbal threat of violence towards her that day.  He merely told her that he wanted her to put everything down in writing.  However, "whether the threat is conveyed by conduct or pure speech is irrelevant."  (*City of San Jose v. Garbett* (2010) 190 Cal.App.4th 526, 539 [analyzing parallel statute set forth under § 527.8].)

According to Harris, Stampolis became aggressive toward her during their confrontation on August 27, 2014, and began raising his voice.  Harris also said that Stampolis gestured towards her with his hands clasped in the shape of a gun.  The video

14

of the incident shows that Stampolis did indeed make several hand gestures toward Harris. Additionally, Harris said that Stampolis stepped close to her, so close that she could feel his breath on her face. She also said she raised her hands at one point, because she thought that Stampolis may strike her. Masur, who was present during the incident, largely corroborated Harris's testimony. Masur said that Stampolis raised his hands and got very close to Harris. Furthermore, Stampolis's behavior made him feel concerned for Harris's safety. Allen and Officer Fekete, who reviewed the video of the incident, both said that they were troubled by Stampolis's behavior. In sum, even though Stampolis did not make an express verbal threat, there was substantial evidence that his actions constituted a "knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (§ 527.6, subd. (b)(2).)

Stampolis, however, maintains that the court's finding is not supported by sufficient evidence. He argues that the surveillance video shown to the court corroborates his version of the events and clearly shows that he was walking away from Harris during the August 27, 2014 incident. Stampolis also insists that the video shows that he was making clapping gestures with his hands and was not mimicking a gun.

Although we agree that the video does not unequivocally show that Stampolis was mimicking a gun with his hands, it is not unreasonable to conclude that he was doing so based on the gestures he was making. Regardless, we find that determining whether or not Stampolis was in fact mimicking a gun with his hands is not vital to our analysis. What is important is that there is sufficient evidence to conclude that Stampolis's gestures and actions that day—such as placing his hands close to Harris, raising his voice, pointing and gesturing, and walking back and forth toward her—as a whole constituted a credible threat of violence.

15

Admittedly, there was evidence that supported Stampolis's version of the events. Stampolis himself testified and contradicted the statements provided by Harris and Masur. Stampolis denied raising his hands in the shape of a gun and explained that he was merely gesturing to Harris to put everything down in writing. However, the trial court stated that it did not find Stampolis's testimony to be credible, and we must defer to the trial court's determinations of credibility. (*Santa Clara County Correctional Peace Officers' Assn., Inc. v. County of Santa Clara* (2014) 224 Cal.App.4th 1016, 1027.)

Stampolis claims that the trial court's credibility determination was erroneous, because it improperly held him to a higher standard when it commented that Stampolis had gone to law school. During the hearing, the trial court referenced Stampolis's legal education, describing him as being a "trained lawyer" that should know that "words are important." However, despite the trial court's mention of Stampolis's legal background, it appears that the trial court found Stampolis not to be credible primarily based on the contradictions in his testimony. Earlier, Stampolis had stated that no reasonable person could find that his gestures appeared to mimic a gun. The court noted that this statement was not credible based on the video and photo of the incident.

Additionally, we reject Stampolis's argument that the August 27, 2014 incident served a legitimate purpose. Stampolis claims he had a legitimate purpose for going to the school, because he went to pick up his son. However, his act of picking up his son was *not* the credible threat of violence found by the court. Rather, the credible threat of violence was the aggressive behavior exhibited by Stampolis toward Harris.

As we previously noted, "[when] assessing whether substantial evidence supports the requisite elements of willful harassment, as defined in . . . section 527.6, we review the evidence before the trial court in accordance with the customary rules of appellate review. We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge in all legitimate and reasonable inferences to uphold the

16

finding of the trial court if it is supported by substantial evidence which is reasonable, credible and of solid value." (*Schild v. Rubin*, *supra*, 232 Cal.App.3d at p. 762.) Resolving the conflicts in the evidence in favor of Harris, we find that sufficient evidence supports the trial court's determination that Stampolis's actions on August 27, 2014, constituted a credible threat of violence.

c. **Sufficient Evidence that Harassment is Likely to Recur**

Stampolis, however, correctly argues that a single act of harassment alone cannot justify a restraining order. An injunction restraining future conduct is only authorized when it appears that harassment is likely to recur in the future. (*Russell*, *supra*, 112 Cal.App.4th at pp. 402-403.)

"[T]he determination of whether it is reasonably probable an unlawful act will be repeated in the future rests upon the nature of the unlawful violent act evaluated in the light of the relevant surrounding circumstances of its commission and whether precipitating circumstances continue to exist so as to establish the likelihood of future harm." (*Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 335, fn. 9 (*Scripps Health*).) In *Scripps Health*, the son of a patient at a hospital got into an altercation with a hospital employee over his mother's care. (*Id*. at pp. 327-328.) The hospital petitioned for an injunction under section 527.8, which was granted.[4] (*Scripps Health*, *supra*, at p. 329.) The appellate court reversed the order after finding that there was no evidence that the son was likely to commit further acts of violence against the hospital's employees. (*Id*. at p. 336.) In so finding, the appellate court noted that there was no prior threat of violence or subsequent threats of violence by the son against a hospital employee, the temporary restraining order was vacated when the son expressly stated that he would stay away from the hospital pending the evidentiary hearing and he abided by

---

[4] Section 527.8 allows employers to seek restraining orders on behalf of their employees and largely mirrors section 527.6.

17

this representation, and the mother had since transferred her health insurance to a different company rendering it unlikely she would return as a patient at the hospital. (*Ibid*.) The court concluded that "given the circumstances surrounding this single incident, the evidentiary record does not establish the likelihood that [the son] would repeat any violent acts against [hospital] employees." (*Ibid*.)

In *Russell*, two attorneys, Douvan and Russell, represented opposite sides in a dispute. (*Russell*, *supra*, 112 Cal.App.4th at p. 400.) Russell petitioned for a restraining order, claiming that Douvan had followed him into an elevator and forcefully grabbed his arm after a court appearance. (*Ibid*.) At the time of the hearing on the restraining order, Russell did not attribute any other threats or violence to Douvan, and both Russell and Douvan informed the court that they did not regularly do business with each other or oppose each other in court. (*Ibid*.) At the hearing, the trial court made it clear that it believed that once a petitioner establishes that there was a battery or assault, the court is obligated to issue an injunction under section 527.6. (*Russell*, *supra*, at p. 399.) It therefore issued an injunction, which the appellate court reversed after concluding that the trial court "construed its role too narrowly" when it determined that a single act of unlawful violence mandated the issuance of a restraining order. (*Id*. at p. 404.)

In this case, the trial court did not expressly make a finding that it was reasonably probable that future harm would occur without an injunction. However, unlike *Russell*, the trial court did not express an erroneous belief that it *needed* to issue an injunction once a single act of harassment is established. Absent indication to the contrary, we must presume that the trial court followed the applicable law and understood that it was required to find that future harm was reasonably probable. (Evid. Code, § 664; *Cahill v. San Diego Gas & Electric Co*. (2011) 194 Cal.App.4th 939, 956.) Given that it issued an injunction, we may infer that the trial court impliedly found that it was reasonably probable that future harassment would occur. (*Ensworth v. Mullvain* (1990) 224

18

Cal.App.3d 1105, 1112.) We conclude that this implied finding is supported by sufficient evidence.

Here, "the court could consider any evidence showing a likelihood of future harassment, including evidence of conduct that might not itself constitute harassment. (§ 527.6, subd. (i) [in determining whether restraining order is needed, court 'shall receive any testimony that is relevant, and may make an independent inquiry'].) Behavior that may not alone constitute [unlawful harassment] logically still might show an intention to resume or continue [unlawful harassment]." (*R.D. v. P.M.*, *supra*, 202 Cal.App.4th at pp. 189-190.)

In this case, Stampolis was a member of the school district's board of trustees and had a son who attended the middle school where Harris worked. Stampolis testified during the hearing that he was usually the one responsible for picking up his son at the middle school. Contrary to the situation contemplated in *Scripps Health* and in *Russell*, it was likely that Stampolis and Harris would have future interactions.

Further, according to the testimony presented at the hearing, Stampolis displayed aggressive and disrespectful behavior towards various witnesses, including Officer Fekete and Allen. Harris was present in the school office when Stampolis interacted with Fekete on August 28, 2014. Fekete indicated that he believed that Stampolis may have tried to move toward Harris during that incident. Allen similarly described the interaction he had with Stampolis as tense, because Stampolis became upset and wanted to record the entire conversation.

Additionally, during the hearing, witnesses, including Harris, testified that Stampolis did not initially comply with the directive to not enter the campus. On September 2, 2014, Harris had to stop Stampolis from entering the campus after he obtained a visitor's pass from another employee at the school's office. Harris testified during the hearing that she felt nervous having Stampolis so close to her.

19

On September 19, 2014, Stampolis came by the school office and questioned Harris about administering visitor passes.

Based on the foregoing, there was sufficient evidence to support the trial court's implied finding that harassment was likely to occur in the future absent an injunction.

### d. **Sufficient Evidence of Emotional Distress**

Lastly, there was sufficient evidence that a reasonable person would suffer substantial emotional distress, and that Harris did in fact suffer from substantial emotional distress. (§ 527.6, subd. (b)(3).) Harris submitted evidence that after the events involving Stampolis she went to the emergency room and was diagnosed with acute anxiety. Testimony from Officer Fekete and Allen supported Harris's claim that Stampolis was aggressive toward her and that she reasonably feared for her safety.

### e. **No Need to Address Whether the Other Incidents Constituted a Course of Conduct**

Next, Stampolis argues that there is insufficient evidence that the events that occurred on August 27, 28, and September 2, 2014, constituted a course of conduct as defined under section 527.6, subdivision (b)(1). He argues that the incidents relied on by the court cannot constitute a course of conduct, because he was merely picking up his son from school, which was a constitutionally protected activity.[5] We need not address these claims.

In order to obtain a restraining order under section 527.6, a trial court needs only to find unlawful harassment exists and that it is probable that an unlawful act will occur

---

[5] We note that the trial court was expressly aware that constitutionally protected activity could not constitute course of conduct. (§ 527.6, subd. (b)(1) ["Constitutionally protected activity is not included within the meaning of 'course of conduct.' "].) During the hearing, the court stated that Stampolis's filing of a harassment complaint against Harris and his complaint of false imprisonment to the police were not considered in its determination that harassment had occurred.

in the future.  As defined, harassment is *either* (1) unlawful violence, (2) a credible threat of violence, or (3) a course of conduct.  (§ 527.6, subd. (b)(3).)  There is no requirement that the trial court must find harassment based on two out of the three circumstances described under section 527.6, subdivision (b)(3).

We have already concluded that sufficient evidence supports the court's conclusion that Stampolis made a credible threat of violence toward Harris on August 27, 2014.  We have also determined that sufficient evidence supports the court's conclusion that it is reasonably probable that unlawful harassment may occur in the future absent a restraining order.  And, sufficient evidence supports the court's conclusion that the harassment caused Harris emotional distress.  Accordingly, we need not address Stampolis's attacks on the sufficiency of the evidence to support the "course of conduct" prong.

## DISPOSITION

The order granting the injunction under Code of Civil Procedure section 527.6 is affirmed.  Harris is entitled to her costs on appeal.

_____

Premo, J.

WE CONCUR:

_____

Rushing, P.J.

_____

Grover, J.

Harris v. Stampolis
H041795

| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. 1-14-CH005881 |
| --- | --- |
| Trial Judge: | Hon. Thomas E. Kuhnle |
| Counsel for Plaintiff/Respondent:<br>Susan E. Harris | Eugene Whitlock |
| Counsel for Defendant/Appellant:<br>Christopher Stampolis | Tomas E. Margain |

Harris v. Stampolis
H041795