Filed 10/27/21  Lord v. Mancino CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| EDWIN FREDERICK LORD,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>HARMONY RENE MANCINO,<br><br>        Defendant and Appellant. | A161323<br><br>(City & County of San Francisco<br>Super. Ct. No. CCH-20-582872) |

Harmony Rene Mancino appeals after the trial court granted Edwin Frederick Lord a civil harassment restraining order against her.  We conclude the evidence does not support a finding that there is a likelihood of future harassment.  We therefore reverse the order.

### FACTUAL AND PROCEDURAL BACKGROUND

Mancino and Lord are housemates in a two-story house in San Francisco.  On the lower floor, Lord occupies one bedroom and a resident named Tom (who acts as property manager) occupies another, and there is a small living room.  Upstairs are bedrooms occupied by Mancino and Mark Chan, as well as a living room.  It appears that in June 2020, Mancino obtained a temporary restraining order against Tom, based on him coming upstairs to sleep in the bedroom next to hers rather than in his own room, and that the temporary order was dissolved when the trial court denied her

request for a permanent order a week or two before the August 14, 2020 hearing at issue in this case.

Lord filed a request for a civil harassment restraining order on June 18, 2020. He alleged Mancino had begun engaging in a pattern of harassment in May 2020, when she put sand into the kitchen and bathroom pipes, requiring a repairman to come to the house on June 6 and 7, and that she did not keep the kitchen and bathroom clean, leading to an increase in ants. Lord also described two incidents in which Mancino tried to enter his room without permission. On June 7, 2020 she "snoop[ed] by sticking her head in [Lord's] room taking notes, sticking her head in Tom's room when he is not there taking notes and leaving without saying anything to [Lord]." On June 9, 2020, Mancino looked into the windows of the downstairs bedrooms, saw that Lord's bedroom door was open, and slowly came through the door. Lord yelled "Hold on" at her because he had sensitive files on his computer. Mancino "flinched" and went back outside the room, then told Lord she was looking for Tom. About an hour later, a woman knocked and asked for Tom, then left when Lord told her Tom was not there. As a result of Mancino's behavior, Lord alleged, he experienced anxiety, nausea, and feelings of paranoia when Mancino was within 15 feet of him.

In her response to the request, Mancino averred that in early June she knocked on Lord's door and they spoke briefly. On one occasion, she looked in Tom's bedroom window to see how much furniture the room contained because Tom had been sleeping next to her bedroom upstairs. The main reason she approached the downstairs area in early June was to serve Tom with a temporary restraining order. She denied clogging the pipes, she said the ants were a longstanding problem predating her tenancy, and she said

2

she had almost no interaction with Lord and had never done anything intentionally to annoy him.

The hearing on Lord's request for a restraining order was held on August 14, 2020, along with a separate request for a restraining order against Mancino filed by Chan, the fourth housemate. Chan complained that he and Mancino had a conflict about her blocking the front door with her umbrella, that she made noise in the house after 10:00 p.m., and that Mancino left sand in his shoes and on the floor. Mancino admitted she had put sand in Chan's shoes and expressed remorse for doing so. The trial court denied Chan's request without prejudice.

As to Lord's request for a restraining order, the order at issue in this appeal, Lord told the court he had interacted with Mancino only a handful of times and their first interaction was pleasant. In May, however, Mancino came downstairs and accused Tom in a hostile manner of going upstairs without permission. On June 7, when the plumber was present, Mancino came downstairs, stuck her head into the room where Lord was typing without saying anything, "looking like she was taking . . . [¶] mental notes," looked into Tom's room, then went to the plumber and talked to him. As to the June 9 incident, Lord explained that Mancino came into his room and appeared to wait for him to say something. He preferred to keep his room private because he worked with confidential medical records. He did not see Mancino put sand in the kitchen and bathroom pipes, but suspected she had done so because the plumber who came to the house said sand was blocking the pipes. Lord acknowledged, though, that the sand might have come from people visiting the beach then washing their clothes in the sink.

Mancino told the court that she had entered the downstairs unit on two occasions, but that she did not recall setting foot in either bedroom, saying it

3

would be "inappropriate" to do so. According to Mancino, the first time she went downstairs was when the plumber came to work on the pipes. The plumber worked downstairs first while Mancino finished washing dishes in the kitchen, which was upstairs; when she was finished she went downstairs. She looked into Lord's bedroom, then saw the plumber in Tom's bedroom and told him the kitchen was free. The second time she went downstairs, she was trying to serve Tom with the temporary restraining order, which she succeeded in doing on June 10, 2020. She denied clogging the pipes and called the accusation "illogical," noting that clogged pipes in the house would affect her own well-being. She denied doing anything intentionally to harass or annoy Lord or make him uncomfortable.

The trial court stated it was "persuaded by what Mr. Lord is saying about you entering his room and continuing to bother him; so I think that does constitute harassment." It granted Lord's request for a restraining order, directing Mancino not to have contact with him for 18 months, to stay three yards away from him at home and 50 yards away while outside the house, and not to harass him. This timely appeal ensued.

## DISCUSSION

Section 527.6 of the Code of Civil Procedure[1] allows a victim of harassment to seek "an order after hearing prohibiting harassment as provided in this section." (§ 527.6, subd. (a)(1).) The statute provides an expedited procedure for enjoining acts of harassment as defined in the statute (*Yost v. Forestiere* (2020) 51 Cal.App.5th 509, 520 (*Yost*)), and authorizes a restraining order if the court "finds by clear and convincing evidence that unlawful harassment exists" (§ 527.6, subd. (i)).

---

[1] All statutory references are to the Code of Civil Procedure.

The scope of the term " '[h]arassment' " for purposes of the statute is limited, encompassing "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (§ 527.6, subd. (b)(3).) " 'Course of conduct,' " in turn, means "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose," including following or stalking someone, making harassing telephone calls, or sending harassing correspondence, but it does not include activity that is constitutionally protected. (§ 527.6, subd. (b)(1).)

The purpose of an order under section 527.6 is not to punish a person for past acts of harassment. (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1265–1266.) Rather, relief is authorized " 'only to prevent threatened injury'—that is, future wrongs." (*Yost, supra*, 51 Cal.App.5th at p. 520.) Accordingly, "[a]n injunction restraining future conduct is only authorized when it appears that harassment is likely to recur in the future." (*Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 496 (*Harris*), citing *Russell v. Douvan* (2003) 112 Cal.App.4th 399, 402–403.)

On appeal, we determine whether the trial court's findings, express or implied, are supported by substantial evidence in the record. (*Harris, supra*, 248 Cal.App.4th at p. 497.) We review de novo " 'whether the facts, when construed most favorably in [the petitioner's] favor, are legally sufficient to constitute civil harassment under section 527.6, and whether the restraining order passes constitutional muster.' " (*Ibid.*)

Mancino challenges the restraining order on a variety of grounds: that entering Lord's room twice does not constitute harassment or a course of conduct as defined in section 527.6; that she was acting in furtherance of her constitutional rights of association, free speech, and petitioning for the redress of grievances; that there is insufficient evidence Lord suffered substantial emotional distress for purposes of the statute; and that there is no evidence to support a finding that future harm is likely. Because we agree with Mancino on at least her last point, we need not consider the remainder of her contentions.

To determine whether it is reasonably probable harassment will recur in the future, courts evaluate the nature of the unlawful act " 'in the light of the relevant surrounding circumstances of its commission and whether precipitating circumstances continue to exist so as to establish the likelihood of future harm.' " (*Harris*, *supra*, 248 Cal.App.4th at pp. 499–500, quoting *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 335, fn. 9.) For instance, in *Scripps Health*, a hospital obtained a restraining order under an analogous statute, section 527.8, against the son of a patient who had an altercation with a hospital employee. (*Scripps Health*, at pp. 327–329.) The appellate court reversed, finding there was no evidence the son was likely to commit further violent acts and noting there were no prior or subsequent threats of violence, the son stated he would stay away from the hospital when the temporary restraining order was vacated and he abided by his agreement, and it was unlikely the mother would return as a patient to the same hospital. (*Id*. at p. 336.)

In *Harris*, in contrast, the evidence was found to support an implied finding that future harassment was likely where a parent who had been aggressive to the principal at his child's school was a member of the school

6

district's board of trustees and was usually the one responsible for picking up his son at the school, leading to a likelihood of future interactions. (*Harris, supra*, 248 Cal.App.4th at pp. 487, 500–501; see *City of San Jose v. Garbett* (2010) 190 Cal.App.4th 526, 531–532, 542–543 [sufficient evidence of likely future harm where appellant who had spoken threateningly to city staff member continued to appear at City Hall regularly and had history of threatening conduct].)

The case here differs from *Scripps Health* in that Mancino and Lord live in the same house and future interactions are likely, if not inevitable. But this record gives no basis to conclude future *harassment* is likely. The trial court's ruling appears to have been based only on Mancino's two entries into Lord's room; there is no indication it found that she clogged the pipes with sand or that she deliberately failed to keep the kitchen or bathroom clean in order to annoy Lord. There was no history of bad blood between Mancino and Lord and nothing to suggest Mancino directed her ire toward him; rather, the most the record indicates is that she was seeking to find *Tom* or the plumber or to examine Tom's room when she thought he was encroaching on her portion of the house. (Compare *R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 189–190 [restrained party had record of past harassment of plaintiff, angry outbursts, erratic behavior, and obsessive focus on plaintiff].) We question whether these two incidents of Mancino entering Lord's portion of the house could qualify as harassment, but in any event Mancino retreated from Lord's room immediately when he made clear she was not welcome, she apparently did not go to his room again in the more than two months between June 9 and the August 14, 2020 hearing, and she acknowledged that going into his bedroom uninvited would be inappropriate. And, to the extent the fact that Mancino put sand in Chan's shoes is relevant, she acknowledged

7

her actions were wrong, they were not directed toward Lord, and indeed, the trial court denied Chan's request for a restraining order.

Under the circumstances, this record does not support an implied finding that Mancino is likely to enter Lord's room uninvited again or harass him in any other way in the future, and we must therefore vacate the restraining order.  Nothing we say, however, is intended to prevent Lord from seeking relief if Mancino harasses him in the future or if she has harassed him since the order went into effect.

## DISPOSITION

The judgment is reversed and the restraining order issued on August 14, 2020 is dissolved.  The parties shall bear their own costs on appeal.


TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*Lord v. Mancino* (A161323)