Filed 8/26/24  Wondries v. Wishengrad CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PATTY WONDRIES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BARRY M. WISHENGRAD,<br><br>    Defendant and Appellant. | B332019<br><br>(Los Angeles County<br>Super. Ct. No. 23PDRO00683) |

APPEAL from an order of the Superior Court of Los Angeles County, Timothy Martella, Judge.  Affirmed.

Kowal Law Group and Timothy M. Kowal for Defendant and Appellant.

Law Offices of Thomas J. Nolan and Thomas J. Nolan for Plaintiff and Respondent.

————————————————————

Appellant Barry Wishengrad appeals the trial court's entry of a three-year civil harassment restraining order protecting respondent Patty Wondries. Wishengrad sent a series of hateful text messages to Patty's husband, Paul Wondries, as Paul lay dying in the hospital.[1] On the day Paul died, Wishengrad sent Patty a text message celebrating Paul's death and informing her that he would also rejoice when she died. He additionally caused at least a dozen black roses to be sent to her. The trial court found, by clear and convincing evidence, that Wishengrad had committed two acts constituting harassment toward Patty (sending the text message and sending the roses), and that Wishengrad's behavior would not stop without court intervention.

On appeal, Wishengrad argues that: (a) the court erred as a matter of law in deeming that his act of sending a text message to Patty as well as his act of sending her black roses constituted a "course of conduct" as that term is used in Code of Civil Procedure section 527.6;[2] and (b) substantial evidence does not support the court's conclusion that his behavior would not stop without court intervention. We affirm.

---

[1] Because Patty and Paul Wondries share a surname, we refer to them by their first name.

[2] Undesignated statutory references are to the Code of Civil Procedure.

2

# FACTUAL AND PROCEDURAL BACKGROUND[3]

## A. *Patty Requests a Civil Harassment Restraining Order Against Wishengrad*

On May 19, 2023, Patty applied for a Civil Harassment Restraining Order against Wishengrad and asked the court to issue a Temporary Restraining Order until her request could be heard. In her petition, she stated the harassment had occurred on May 11, 2023.

### 1. Background

Patty explained that her recently deceased husband Paul had owned and managed several local automobile dealerships. Wishengrad had been the general manager of one such dealership. According to Patty, "Paul uncovered certain unethical business practices of Wishengrad," which led to Wishengrad's termination as well as Paul's lodging a criminal complaint. Due to this, Wishengrad "harbored hatred and bitterness" toward Paul. In 2010, Wishengrad sued, alleging harassment and discrimination, and Paul filed a cross-complaint. The parties agreed to arbitrate the dispute. The proceedings were "bitter and contentious" and did not resolve until 2016. Patty claimed that Wishengrad did not win on his affirmative claims but recovered a "modest sum" of attorneys' fees for defending against the cross-complaint. Patty alleged that "[t]he parties never reconciled and it [is] well understood in the business community that Wishengard [*sic*] harbored deep bitter resentment of Paul and me."

---

[3] We limit our summary to the facts and procedural history relevant to the issues raised on appeal.

3

## 2. Wishengrad Sends Text Messages to Paul on His Deathbed

Patty's petition also alleged: "Beginning on March 1, 2023, and continuing up to Paul's death, Wishengrad authored and transmitted malicious, vile, and harassing text messages to Paul's iPhone. Many of the text messages were addressed to Paul while he was gravely ill and on his deathbed at Cedars-Sinai Hospital." Patty was always at Paul's bedside and Paul would share the text messages with her. When Paul was unable to read the messages, he asked Patty to read them aloud. Patty stated that she was "shocked, hurt, and bewildered by Wishengrad's text messages."

One text message, sent on March 1, 2023, read: "The gates of HELL are open and waiting for you! Your presence has been expected for a long time. All your lies and deceitful ways guaranteed you a spot in hell. Good riddance[,] you cockroach. The world will celebrate your death! It's now a far better planet without you, you POS scumbag. Barry."

Another, also sent on March 1, 2023, read: "This is from someone in your closest circle. Everyone shares this sentiment. [¶] Omg!! He actually deserves it, you would think that on your death bed you would want your children around and ask for forgiveness but noooo the piece of shit shut them down cruelly. Instead he hurriedly transferred everything over to the bag o[f] bones he calls a wife and left nothing for his kids. Not even a kind word to let them know they meant something to him. What kind of a selfish, cold, heartless person behaves like that! I thought those people only existed in movies. I told you, the devil has been preparing hell for him, he stocked up on pineapples . . . ready to shove up his ass for eternity."

4

Yet another, sent on March 2, 2023, read: "The clock is ticking! [¶] Tick-tock! [¶] By the way[,] I don't accept FaceTime calls. Only text messages from scum!" When Paul responded, "Pass. No further response from me," Wishengrad replied, "At least you're thinking about me in your last hours."

The next day, Wishengrad sent another message stating that "Jennifer, Parker, Taylor, Justin and Jill, they are all happy and thriving!!! A state of being that your money can't buy! You bet on the wrong horse with your 'new' family. I bet they are buying new dancing shoes!"

Two weeks later, on March 17, 2023, Wishengrad sent a text message stating that he was in Las Vegas and "odds say you won't make it through April. [¶] You scum bucket POS [¶] Fred Streeter is waiting for you before you enter the gates of hell."[4] The next day, Wishengrad texted a picture of a cup filled with ice and a presumably alcoholic liquid and the message "Cheers to hell[']s gate."[5]

### 3. Wishengrad Sends a Text Message to Patty After Paul's Death

According to the petition, after Paul passed away from cancer at 1:15 a.m. on May 4, 2023, Patty went home and fell into

---

[4] Wishengrad later clarified that Streeter was Paul's "former partner," who "tragically committed suicide." Wishengrad claimed Paul "financially ruined" Streeter using "ruthless business practices and financial threats" and that Paul had "chuckled" after learning of Streeter's suicide.

[5] Although Patty's petition stated that Wishengrad's text messages "continu[ed] up to Paul's death," this is the last text message sent from Wishengrad to Paul in the appellate record.

an exhausted and fitful sleep.  At 3:20 p.m. that same day, she received a text message that read:  "Patty, so very satisfied with your loss, only sorry he didn't die sooner.  The world just got brighter yesterday with your piece of shit taking his last breath, the only thing that could have made it better was if you had painfully died with him., [*sic*]  I guarantee that a seat right next to Paul is waiting for you in HELL, appropriately where you both belong.  Live in misery and looking forward to hearing about your own passing, it will be another celebration for sure."  Patty described the great emotional trauma this message caused her.

### 4.    Black Roses Are Sent to Patty

According to her petition, in the early afternoon on May 11, 2023, Patty discovered a box on her front porch.  Inside were a dozen black roses.  Patty took the box to the nearest police station, and law enforcement interviewed her and "issue[d] a citation reporting [Patty] as a victim of []harassment."  Patty stated she was "investigating the sender's information from Federal Express" and would "issue a subpoena" before the hearing on her petition.

### B.    *Wishengrad Responds to the Petition*

Wishengrad's counsel averred in a declaration that, on May 30, 2023, he was served with Patty's restraining order papers after he "agreed in writing to accept service on [his] client's behalf as requested by opposing counsel and authorized it to be done by e-mail for the sake of efficiency."  However, two days later, he claimed that Wishengrad was personally served at home with the same papers.

Wishengrad filed his response in June 2023.  He admitted sending the text message to Patty and claimed that the black

6

roses were sent not just by him, but "by a group of former Wondries employees who had been viciously treated by the Wondries family."[6]  He justified the text message "given the utterly vicious conduct by the Wondries family toward numerous Wondries dealership employees over the years, including Barry Wishengrad."[7]  He also justified the text messages sent to Paul "given Paul Wondries'[s] wicked behavior toward so many Wondries employees including Barry Wishengrad."

However, Wishengrad claimed that he would no longer communicate with Patty because there was "no further need to do so now that Paul Wondries and his wicked leadership are over." He further asserted that, had Patty or any one of her attorneys asked him to stop communications, he would have.  He declared that "[t]he emotional catharsis is now over, and I have no desire to contact Patty Wondries or any of the Wondries family because I have won by outliving Paul Wondries, running my dealerships in an honest manner, and earning the respect of my employees by treating them with dignity."  Wishengrad gave several examples of how he believed Paul and Patty Wondries had mistreated their employees and partners and claimed that those former employees, "who have been viciously harmed by the Wondries

---

[6] Wishengrad also stated the black roses had been sent "on May 11, 2023."

[7] Wishengrad claimed he was fired as retaliation for his objections to "repeated misconduct by Paul Wondries" and his refusal to "commit perjury" in Paul's divorce from his first wife. He declared that the arbitrator had exonerated him regarding Paul's accusations of financial impropriety, as had the police detective assigned to investigate the allegations, and Paul's own sister, a former deputy district attorney.

family (including by Patty Wondries) had a right as a group to send black roses to symbolize the cruelty of the Wondries family." Two other former employees of Wondries dealerships submitted similar declarations.[8]

### C. *The Court Issues a Civil Harassment Restraining Order*

At the court hearing on Patty's restraining order, Patty testified that Paul had been hospitalized beginning in March 2023, that she had stayed with him during his hospitalization, and that he had received several text messages from Wishengrad while in the hospital. She described receiving Wishengrad's text message to her the day that Paul died, and how the message horrified her.[9] Patty also testified that she received three dozen black roses on May 4 (her petition stated she had received a dozen black roses on May 11) and that she took them to the police because she was afraid Wishengrad "really wanted to hurt me now that my husband was gone."

Wishengrad testified that he had sent the text message to Patty and was part of the group that sent her the black roses. He expressed no remorse for sending the roses because "Paul Wondries had tried to destroy my life." When the court asked him what effect he was trying to achieve by sending the roses, Wishengrad responded, "It's called an exclamation point at the

---

[8] At the hearing on the restraining order, Wishengrad testified that these two former employees now worked for him and provided declarations at his request.

[9] At the hearing, she testified that Paul died on May 3 (she stated May 4 in her petition) and that she had received Wishengrad's text that same afternoon.

end of the sentence." He elaborated that Patty was an "integral part with Paul" and that there was a "dislike for Paul Wondries and a dislike for Patty being his partner in crime." In response to his counsel's question of whether winning in arbitration against Paul compensated him or replaced the anxiety and stress he was under for six years, Wishengrad responded, "No, not even close." When the court asked if "that [was] why you sent the emails [*sic*] to the hospital room," Wishengrad responded, "I believe so, yes."[10]

After Wishengrad testified he had no further need to contact the Wondries family, the court asked him why he had a need to contact them six years after the litigation had ended. While Wishengrad denied that the dispute had been "eating at" him, he conceded "it's always sat back in the back of your mind," and that it was "in [his] mind enough that [he] sent the text and the flowers." In response to the court's skepticism that it was no longer in his mind now, Wishengrad pointed out that Paul had passed away. When the court reminded Wishengrad that Patty had not, Wishengrad responded, "Yeah, but that's, you know, water under the bridge." On cross-examination, Wishengrad admitted that he had placed the order for the black roses and stated that a company that he owned—Van Nuys Nissan—paid for them.[11]

---

[10] The court corrected itself with "a text?" and Wishengrad responded, "yes."

[11] Wishengrad also intended to call as witnesses the two other individuals who submitted declarations in opposition to Patty's request for a restraining order. However, when informed that these witnesses would testify that they were part of the group that sent the black roses and discuss their mistreatment by

*(Fn. is continued on the next page.)*

In closing, Patty's counsel argued that Wishengrad had admitted to the text messages and the black roses, that he had to have known that Patty was reading the messages sent to Paul, and that no reasonable person could read the messages and not be horrified. He also deemed unbelievable Wishengrad's claim that this was now "water under the bridge."

Wishengrad's counsel argued that Wishengrad's statement that he would not contact Patty anymore was credible, evidenced by the fact that after sending the single text message and the black roses to Patty, he never tried to contact her again. He also argued that Wishengrad's actions were justified due to his history with Paul. Counsel concluded that Patty had failed to prove, by clear and convincing evidence, that there was "a course of conduct that isn't constitutionally protected" or that Wishengrad would "do it again."

The court found clear and convincing evidence to issue the restraining order. It found there had been two incidents of harassment—the text message and the sending of the black roses—and that these events were done specifically to harass Patty. It further found that "the behavior will not stop without court intervention," stating it did not believe Wishengrad's testimony that the anger was "all over" and no longer in his mind. The court therefore issued a three-year restraining order.

Wishengrad timely appealed.

---

Paul Wondries, the court deemed the testimony cumulative and unnecessary.

10

## DISCUSSION

"A person who has suffered harassment . . . may seek a temporary restraining order and an order after hearing prohibiting harassment." (§ 527.6, subd. (a)(1).) "Harassment" includes "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (§ 527.6, subd. (b)(3).)

### A. *The Court Did Not Err in Finding a "Course of Conduct"*

#### 1. Wishengrad's Actions Constitute a Course of Conduct

A " '[c]ourse of conduct' is a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including . . . sending harassing correspondence to an individual by any means." (§ 527.6, subd. (b)(1).) A "series of acts" means more than one act. (*Leydon v. Alexander* (1989) 212 Cal.App.3d 1, 4.) Here, the court found there had been two acts: the sending of the text message and the sending of the black roses.

Wishengrad contends the court erred in treating these events as distinct because "sending a text and ordering the black roses to be delivered within a few hours" constituted a "single incident." " '[W]hether the facts, when construed most favorably in [petitioner's] favor, are legally sufficient to constitute civil harassment under section 527.6 . . . [is a] question[] of law

11

subject to de novo review.' " (*Hansen v. Volkov* (2023) 96 Cal.App.5th 94, 104.)

Reviewing the record independently, we agree with the trial court's determination that the text message and the black roses constitute two separate events. Although there is some confusion as to whether Patty received the roses on May 4 or May 11, there is no question that she received them on a different day than the text message. Further, the text message did not reference the roses, or indicate that the two acts were intended as a single expression of hatred. On such a record, we do not see how the events can be viewed as a single incident.

### 2. Wishengrad's Case Citations Are Inapt

Wishengrad cites three cases to bolster his proposition that his actions should be considered a single incident of harassment: *Leydon v. Alexander*, *supra*, 212 Cal.App.3d 1, *Hansen v. Volkov*, *supra*, 96 Cal.App.5th 94, and *Thomas v. Quintero* (2005) 126 Cal.App.4th 635 (*Thomas*). *Leydon* and *Hansen* are easily distinguished because, in those cases, the "incidents" the trial court found to constitute a "course of conduct" occurred during a single encounter between the parties. (*Leydon* at p. 3 [appellant's conduct of asking respondent if she was still sleeping with the city manager and using vulgar names to refer to her could not support issuance of restraining order because conduct occurred in single visit to respondent's office]; *Hansen* at p. 106 [only conduct by appellant not constitutionally protected could not support issuance of restraining order because it was "singular event" in which appellant visited respondent's office and refused to leave].) Here, by contrast, Patty suffered the harassment on two separate days in two separate incidents and these incidents employed different media to convey hateful expressions.

12

Although ultimately inapposite, *Thomas* merits further discussion. *Thomas* involved a landlord (Thomas) seeking a civil harassment restraining order against his tenant (Quintero). In his petition, Thomas claimed Quintero was part of a group that appeared at Thomas's church to harass church members and embarrass him. (*Thomas*, *supra*, 126 Cal.App.4th at p. 654.) Thomas additionally alleged that "Quintero and others had also demonstrated at Thomas's home." (*Id.* at p. 643.) "The conduct sought to be enjoined was demonstrating and leafleting by Quintero and others against Thomas's alleged practices as a landlord of multiple rental units." (*Id.* at p. 641.) In response to the petition, Quintero filed an anti-SLAPP motion. (*Ibid.*) The appeal concerned the trial court's denial of the motion. (*Ibid.*)

Wishengrad contends that *Thomas* stands for the proposition that "organizing and engaging in multiple demonstrations against Thomas did not constitute a 'course of conduct' as contemplated by the statute," and impliedly argues that Wishengrad's actions should also not constitute a course of conduct. Wishengrad misinterprets *Thomas*.

While discussing the denial of Quintero's anti-SLAPP motion, the appellate court analyzed whether Thomas had shown a likelihood to prevail on the merits of his petition for a civil harassment restraining order and concluded that he had not. (*Thomas*, *supra*, 126 Cal.App.4th at p. 662.) It found Quintero's activity to be constitutionally protected but added that "[e]ven if the conduct was not constitutionally protected, Quintero was not engaged *qualitatively* in a 'pattern of conduct' as contemplated by the statute." (*Id.* at p. 663, italics added.) We interpret the court's use of the word "qualitatively"—as opposed to "quantitatively"—as a comment on the type of activity Quintero

13

was engaging in, and whether the activity could qualify as harassment, rather than on the number of incidents involving Quintero.[12]

Unlike protesting an individual's alleged practices as a landlord, there is no "legitimate purpose" to sending a text message that gloats over the death of the recipient's husband, and to arranging for the delivery of black roses as an "exclamation point" to one's animosity. The activity here is qualitatively different from the activity discussed in *Thomas*; *Thomas* therefore has no application to the facts in this case.

## B.     *The Court Did Not Err in Finding That Wishengrad Would Continue to Harass Patty Without Court Intervention*

Although not expressly provided in section 527.6, case law has established that "[a]n injunction restraining future conduct" under that statute "is only authorized when it appears that harassment is likely to recur in the future." (*Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 499.) Here, the court found that Wishengrad's "behavior will not stop without court intervention."

Wishengrad contends that substantial evidence does not support the court's finding. He points out that he had no contact with Patty from "2010 until May 3, 2023," when he sent the text message, and then, after sending the black roses, voluntarily had no further contact with her until informed of the temporary restraining order in late May, or thereafter. He also references

---

[12] For a course of conduct to be considered "harassment," it must "serve[] no legitimate purpose" and "cause a reasonable person to suffer substantial emotional distress." (§ 527.6, subd. (b)(3).)

14

his testimony that the black roses were "the intended endpoint" of his communication with Patty and claims that "[n]othing in the record contradicts his sworn representations."

" '[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof.' " (*Hansen v. Volkov*, *supra*, 96 Cal.App.5th at p. 104.)  We conclude such evidence exists.

Wishengrad made clear that he blamed Patty as well as Paul for the anxiety and stress he suffered for six years.  He made numerous references to being "viciously treated by the Wondries family," not just Paul.  He viewed Patty as an "integral part with Paul" and expressed a "dislike for Paul Wondries and a dislike for Patty being his partner in crime."

In addition, despite not contacting Patty for 13 years, he harbored sufficient anger toward her to send her a vile text message the day her husband died, as well as to arrange for black roses to be sent to her as an "exclamation point" to his hostility. The text message strongly implied that Wishengrad's hatred and harassment would persist even after Paul's death.  It stated: "Live in misery and looking forward to hearing about your own passing, it will be another celebration for sure."  Although it is true that there is no evidence that he contacted her between the time the black roses were sent and the time when he learned of the TRO several weeks later, there was also a two-week break in the messages he sent to Paul in March 2023.  Additionally, nothing in the record shows that he contacted Paul after March

15

2023—but he still sent a hateful message to Patty nearly two months later, in May 2023. Thus, the fact that Wishengrad had not immediately continued his harassment of Patty after sending her the black roses was not conclusive evidence that no further harassment would occur. There was ample evidence from his own actions and words to conclude that his harassment was likely to continue. He told Patty that "the only thing that could have made [Paul's death] better was if you had painfully died with him" and "[I'm] looking forward to hearing about your own passing, it will be another celebration for sure."

In addition, the court specifically disbelieved Wishengrad's testimony that his animus toward Patty was "water under the bridge." (*Harris v. Stampolis, supra*, 248 Cal.App.4th at p. 498 ["we must defer to the trial court's determinations of credibility"].) If Wishengrad still harbored inimical feelings toward Patty, it was reasonable to conclude that further harassment would occur. Viewed as a whole, the record contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability that Wishengrad's behavior was likely to recur without court intervention. Thus, the trial court did not err in issuing the restraining order.

16

## DISPOSITION

The trial court's order is affirmed.  Respondent Patty Wondries is awarded her costs on appeal.

NOT TO BE PUBLISHED


KELLEY, J.[*]

We concur:


ROTHSCHILD, P. J.


BENDIX, J.

---

[*]Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.