Filed 1/6/23  Saks v. Landi CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| WAYNE JOSEPH SAKS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>PASCAL JEAN-BAPTISTE LANDI,<br><br>Defendant and Respondent. | B311806<br><br>(Los Angeles County<br>Super. Ct. No. 20STRO06439) |

APPEAL from an order of the Superior Court of Los Angeles County, Joshua D. Wayser, Judge.  Affirmed.

Fisher, Klein & Wolfe and David R. Fisher; Macias Counsel and Sean E. Macias, for Plaintiff and Appellant.

BDG Law Group, Robert D. Bergman and Richard A. Fond, for Defendant and Respondent.

——————————

Appellant Wayne Joseph Saks appeals from the trial court's order denying his request for a civil harassment restraining order pursuant to Code of Civil Procedure[1] section 527.6.  Saks sought the restraining order against respondent Pascal Jean-Baptiste Landi, who struck Saks in the face following a dispute over a parking space in the condominium complex where they both owned units.

The trial court concluded that Saks failed to demonstrate a likelihood of future harm, a required element for obtaining a restraining order against Landi under section 527.6.  Because we find the evidence does not compel a contrary conclusion, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      Saks's restraining order request

Saks filed a request for a civil harassment restraining order against Landi.  Saks alleged that on November 19, 2020, as he was walking to his car in the parking structure of a condominium complex where he and Landi each owned units, Landi verbally accosted him for parking in one of Landi's designated parking spaces.  Saks further alleged that despite his efforts to avoid a confrontation with Landi, Landi struck him in the face causing serious injury.

Although Saks's restraining order request was based primarily on the parking structure incident, he also alleged that Landi had engaged in unspecified harassment of him in connection with Landi's role as a board member of their

---

[1]      All subsequent undesignated statutory references are to the Code of Civil Procedure.

2

homeowners association.  Saks's request also identified two lawsuits that he and Landi were involved in related to the condominium complex.  In one of the lawsuits, Saks was suing Landi and their homeowners association.

The same day that Saks filed his request, the court issued a temporary restraining order against Landi requiring him to stay away from Saks.  The temporary restraining order remained in effect until February 3, 2021, the date of a continued hearing on Saks's request for a restraining order.

## II.    Landi's response to Saks's restraining order request

Landi filed a response to Saks's restraining order request.  Landi's response accused Saks of, among other things, antagonizing residents of their condominium complex.  Landi claimed Saks had boarded elevators without a mask during the COVID-related safety and health orders.  He also described the lawsuit that Saks filed against the homeowners association and its board members, including Landi, as "baseless."

Regarding the November 19, 2020 incident, Landi claimed that he was in the parking structure and noticed that Saks had parked in one of his parking spaces.  Saks then appeared, and Landi asked him to move his car.  Landi also asked Saks to wear a mask while in public places in the building.  According to Landi, Saks "aggressively approached" him and said he could use Landi's parking space "if he wanted to."  Landi asked Saks to "move away from him," but Saks refused, leading "Landi to push/hit Mr. Saks away from Mr. Landi, as he was rightfully fearful of what Mr. Saks might do next."

Landi also included five declarations with his response.  According to the response, the declarations were from "other owners of condominiums in the building corroborating that Mr.

3

Saks is an aggressive individual who enjoys causing problems, and getting people to react to his actions."

## III. Restraining order hearing

The court held a two-day video hearing regarding Saks's restraining order request. We briefly summarize the hearing.

### A. Landi's testimony

Saks first called Landi as an adverse witness. Landi testified that he had lived in the 11-unit condominium complex since August 2014. Landi was a board member of the homeowners association and former board president. His condominium unit was on a different floor and the other side of the building from Saks's unit.

Prior to the incident on November 19, 2020, Landi had not interacted much with Saks. Landi recalled only one interaction a few weeks before the incident when Saks entered an elevator and coughed at Landi as Landi exited. Landi generally tried to avoid Saks because he believed Saks had been antagonistic with contractors in the building. Landi's wife had also complained to Landi about Saks. Citing these events, Landi described the parking structure incident as a "culminating event."

Landi denied that the lawsuit Saks had filed against him and the homeowners association was "a source of significant stress in the building." He explained that while the lawsuit could affect insurance rates, none of the individual homeowners had paid any attorney fees. At the time of the parking structure incident, Landi was unaware that the day before Saks had given deposition testimony in the lawsuit.

On November 19, 2020, Landi went to the parking structure to get his bicycle and noticed that Saks had parked in

4

one of Landi's spaces.[2]  Saks then entered the parking structure.  Landi immediately told Saks that Saks had parked in one of his spaces, and asked Saks to wear a mask in the building.  Landi recalled that Saks aggressively approached him and said something like Saks "had the right to use any parking spot that he wanted."

Coincidentally, Saks was recording video footage on his phone as he entered the parking structure.  According to the footage, Saks did not make such a statement.  The footage, which is aimed at the ground and does not clearly show Saks or Landi, depicts that after Landi asked Saks to move his car, Saks denied knowing the parking space belonged to Landi.  Landi responded, "Are you fucking kidding me?"  After Saks asked Landi to "relax," Landi appears to have responded, "You should wear a mask."

Landi testified he then "pushed" Saks in the face because Saks refused to move away from him.[3]  Saks did not strike or push back at Landi.  The video footage briefly shows Saks bleeding from his lip.  Landi testified that he was surprised to see Saks wounded.

After the incident, Landi stayed about 10 to 20 yards away from Saks and followed him out of the parking structure.  Landi

---

[2]     Landi had five spaces in the parking structure.  One of those spaces, where Saks had parked, was separate from the other four and adjacent to Saks's two spaces.  Landi testified that Saks had never parked in Landi's space before.

[3]     Landi denied striking Saks with his fist.  A police report from the incident states that Landi "punched Saks with his fist one time on the right side of [Saks's] mouth."  The video footage does not show Landi strike Saks.

5

called the police because he saw that Saks was hurt, and he waited for the police to arrive. While he waited for the police, Landi stayed on the opposite side of the street from Saks because he knew that Saks wanted Landi to stay away from him. The police later arrested Landi. Landi did not apologize to Saks after the incident but was sorry he struck Saks and agreed that he had lost his control.

After imposition of the temporary restraining order, Landi was able to enter and exit the condominium complex without having any contact with Saks. The building has a private elevator to Landi's unit, but it was not in service at the time of the hearing.

### B.   Saks's testimony

Saks testified next. He had owned a unit in the condominium complex since 2005. Because Saks's unit had water damage, he did not reside there either at the time of the incident or the hearing. At the time of the hearing, Saks had only begun to obtains bids to repair the unit and expected the repairs to take "some time." Before the incident, Saks visited his unit five to six times a week.

Saks described his relationship with Landi as "aggressive and violent." Even so, he testified that the only violent incident with Landi was in the parking structure on November 19, 2020.[4] Saks testified that he generally tried to avoid Landi.

---

[4]   Saks also described an incident several months before the hearing when Landi "tried to run into [him] on the sidewalk" with his bicycle while Saks was outside near the building's driveway. Landi denied doing so.

At the time of the hearing, Saks was suing the homeowners association, Landi, and others.[5] Saks's counsel described the lawsuit as involving "bad faith handling of repairs and misconduct."

On November 18, 2020, one day before the parking structure incident, Saks gave deposition testimony in the lawsuit. According to Saks's hearing testimony, during the deposition he said that Landi had mistreated the owner of the unit next to Saks's unit; that Landi had stopped repair work from being performed on Saks's unit; and that Saks believed Landi was "picking on [him] for years because [he is] gay." Landi was not present at the deposition.

On the morning of November 19, 2020, Saks went to the condominium complex to retrieve some belongings from his unit. Parking spaces in the building are marked with the number of the corresponding unit. Until that morning, however, Saks was unaware he had only two parking spaces in the building. Saks did not park in either of those spaces because his former partner's car was there already and he did not have enough room.

---

[5] Saks asks that we take judicial notice of the second amended complaint in *Saks, et al. v. Pink, et al.*, Los Angeles Superior Court case No. 19SMCV00289; and the second amended complaint and cross-complaint in *Siderman, et al. v. Pink, et al.*, Los Angeles Superior Court case No. 19SMCV01637. We decline to take judicial notice because Saks fails to establish these pleadings were before the trial court, and because these pleadings are not germane to the disposition of this appeal. (See *Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 687 fn. 10 [declining to take judicial notice "of matters that were not before the trial court" and that were "irrelevant to the disposition of this appeal"].)

7

Saks thus parked in an available space adjacent to his spaces that, unbeknownst to him, belonged to Landi.

At the time of the incident, Saks was carrying some bags and his dog and walking to his car in the parking structure. As Saks entered the parking structure he saw Landi, who shouted at Saks about using his parking space.[6] Saks tried to avoid Landi, but Landi confronted him. Saks asked Landi to calm down, but Saks saw Landi take "what [he] believed to be his metal bicycle lock in his fist" and hit Saks in the face with it.

Saks started bleeding and was in shock. He tried to call 911 but did not have cell phone service. As Saks started to exit the parking structure, he noticed Landi walking his bicycle next to him. According to Saks, Landi shouted that "he didn't want [Saks] in the building" and that "he was sick of the fucking lawsuit," and only "changed his tone" as they neared an area with security cameras. Landi, however, denied yelling at Saks as they exited the parking structure.

---

[6] Saks testified that he believed Landi was waiting for him in the garage. When asked why he believed that, Saks testified, "I think because there had been the deposition less than 24 hours before where I spoke specifically against him. He had seen that I had arrived in the morning as I usually do, pretty much the same time, and he was waiting there, standing next to his bicycle, and he attacked me." When asked whether it was "normal to see" Landi in the garage, Saks responded, "Well, I didn't say it's abnormal to be in the garage, but it's only the two of us at the moment that really parked down there since the other units are vacant except for one other penthouse." When asked whether he knew if Landi was aware of what happened at the deposition the day before the parking structure incident, Saks testified, "I do not know 100 percent, no. I know by his actions."

After exiting the parking structure, Saks and neighbors called 911. Police and emergency medical personnel arrived soon afterwards. Saks also contacted his attorney, who arrived and took photographs of Saks's injury.

Saks suffered blunt force trauma from the incident and had plastic surgery later that same day to treat an injury to his lip. He needed 17 stitches and has had five follow-up procedures to treat the injury since then. He also suffered a chipped tooth, and unspecified injuries to his head and neck.

Saks now fears for his safety and makes sure to be accompanied whenever he returns to the condominium complex. He had returned to the building only five or six times after the incident and did not see Landi. Saks explained that in addition to Landi's private elevator, there are stairs in the building that go directly from Landi's unit to Landi's parking spaces. Saks never uses those stairs; he uses a different staircase on the opposite side of the building.

## C. Court's ruling

At the conclusion of Saks's case, Landi's counsel attempted to introduce the five declarations that were attached to his response to the restraining order request. The court explained that it would accept the testimony in the declarations if the witnesses were available to testify subject to cross-examination.

Landi attempted to call only one such witness, but the witness had technical difficulties connecting to the video hearing. Landi therefore did not call any witnesses.

In its ruling, the court observed that while a single act of " 'unlawful violence' may be sufficient to support a [civil harassment restraining order], such an act, in and of itself, does not entitle a petitioner to a [civil harassment restraining order]."

9

Rather, "in addition to finding that a respondent has engaged in 'harassment,' a trial court must also find reasonable probability of future harm absent an injunction."

The court acknowledged that Saks and Landi lived in the same building and "are in the midst of other unrelated litigation," but found that there was not "credible evidence of prior abuse or any abuse that occurred after the incident." The court further noted that Landi was "upset about [Saks] not wearing his mask on the property and parking in his parking spot. While that does not of course justify the conduct, it is part of the overall context." The court also emphasized that the "parties have had significantly limited prior interaction; petitioner does not stay at the building currently and there is more than one way in and out of the building, although not the garage. Also, Respondent has his own dedicated elevator in and out of his unit at the building. Respondent also called the police about the incident and his testimony credibly explained his lapse in judgment."

Based on these facts, the court found the matter distinguishable from *Harris v. Stampolis* (2016) 248 Cal.App.4th 484 (*Harris*), which affirmed the issuance of a restraining order after "five separate incidents of aggression by a middle-school student's parent against the school's principal." Instead, it compared the case to *Russell v. Douvan* (2003) 112 Cal.App.4th 399 (*Russell*), "in which the appellate court reversed the grant of a restraining order on the ground there was no substantial evidence of a threat of future harm following a single incident of harassment by an attorney who had forcibly grabbed opposing counsel by the arm after a hearing." The court acknowledged the incident here was worse than in *Russell* in light of Saks's significant injury, but emphasized that there was no additional

10

personal or property damage other than the parking structure incident. Last, the court did not find "persuasive under the circumstances the testimony that [Saks] is currently in fear of [Landi]."

The court concluded, "Given the lack of past interaction, and that this was a one time incident," Saks had "not met his significant burden of proof under Section 527.6 and thus his request for a [civil harassment restraining order] is denied."

Saks timely appealed.

## DISCUSSION

Saks contends substantial evidence does not support the trial court's conclusion that a restraining order was unwarranted due to the lack of past interaction between Saks and Landi and because this was a one-time incident. He further contends the trial court misconstrued section 527.6 and applicable caselaw. Last, he contends the trial court improperly considered excluded evidence in denying his request for restraining order.

## I.    Applicable law and standard of review

Section 527.6, subdivision (a)(1) provides that "[a] person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order and an order after hearing prohibiting harassment as provided in this section." Subdivision (b)(3) defines "[h]arassment" as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose." Subdivision (b)(7) defines "unlawful violence" as "any assault or battery, or stalking as prohibited in Section 646.9 of the Penal

11

Code, but does not include lawful acts of self-defense or defense of others.”

"A temporary restraining order may be issued with or without notice, based on a declaration that, to the satisfaction of the court, shows reasonable proof of harassment of the petitioner by the respondent, and that great or irreparable harm would result to the petitioner." (§ 527.6, subd. (d).) Such a temporary restraining order "shall remain in effect, at the court's discretion, for a period not to exceed 21 days, or, if the court extends the time for hearing under subdivision (g), not to exceed 25 days, unless otherwise modified or terminated by the court." (*Id.*, subd. (f).) "Within 21 days, or, if good cause appears to the court, 25 days from the date that a petition for a temporary order is granted or denied, a hearing shall be held on the petition." (*Id.*, subd. (g).)

At the ensuing hearing, "the judge shall receive any testimony that is relevant, and may make an independent inquiry. If the judge finds by clear and convincing evidence that unlawful harassment exists, an order shall issue prohibiting the harassment." (§ 527.6, subd. (i).) Because an injunction "serves to prevent future injury and is not applicable to wrongs that have been completed," the petitioner must also show a high probability of future harm. (*Russell, supra,* 112 Cal.App.4th at pp. 402–404; see also *Harris, supra,* 248 Cal.App.4th at p. 499 ["An injunction restraining future conduct is only authorized when it appears that harassment is likely to recur in the future."]).

We review a trial court's denial of a request for a restraining order for abuse of discretion (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 849–850), and the trial court's express and implied factual findings for substantial evidence (*R.D. v. P.M.* (2011) 202

12

Cal.App.4th 181, 188). Under the substantial evidence standard of review, "we accept all evidence supporting the trial court's order," "we completely disregard contrary evidence," "we draw all reasonable inferences to affirm the trial court," and "[w]e do not reweigh the evidence." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581.) A party challenging the trial court's findings under this standard of review bears an " ' "enormous burden." ' " (*Id*. at p. 582.)

## II. The trial court did not err in determining there was insufficient evidence harassment was likely to recur

### A. *Scripps*, *Russell*, and *Harris*

As noted above, "[a]n injunction restraining future conduct is only authorized when it appears that harassment is likely to recur in the future." (*Harris, supra,* 248 Cal.App.4th at p. 499, citing *Russell, supra,* 112 Cal.App.4th at pp. 402–403.) Because Saks's appeal focuses primarily on this issue, and in particular the decisions in *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324 (*Scripps*), *Russell*, and *Harris*, we briefly discuss those cases.

In *Scripps*, the defendant, upset over the discharge of his mother from the hospital, abruptly left a meeting with hospital staff. (*Scripps, supra,* 72 Cal.App.4th at p. 328.) As he left the meeting, the defendant "pulled the door open, striking [a hospital employee] with the door and pushing her into the wall." (*Ibid*.) Finding that the son was the cause of "unlawful violence" within the meaning of section 527.8, a parallel statute to section 527.6, the court imposed a restraining order. (*Scripps,* at p. 330.)

The Court of Appeal reversed, rejecting the hospital's argument that "once the court finds by clear and convincing evidence a defendant was the precipitating cause of an act of

13

unlawful violence," the plaintiff is entitled to a restraining order. (*Scripps*, *supra*, 72 Cal.App.4th at pp. 330–331.) Rather, concluding the statute was not intended to alter the "underlying nature and purpose of a prohibitory injunction," the court held that a plaintiff must "establish great or irreparable harm would result" without issuance of the restraining order "because of the reasonable probability the wrongful acts will be repeated in the future." (*Id.* at p. 331.)

The court also ruled that the evidence was insufficient to show the defendant's "wrongful acts would be repeated in the future." (*Scripps*, *supra*, 72 Cal.App.4th at p. 336.) It noted that there were no prior or subsequent threats of violence by the defendant; that the temporary restraining order had been vacated based on the son's assurance that he would stay away from the hospital pending the evidentiary hearing; and that the mother had changed her insurance coverage, making it unlikely she would return to the hospital. (*Ibid*.)

In *Russell*, an attorney followed his opposing counsel into an elevator after a court appearance and forcefully grabbed his arm. (*Russell*, *supra*, 112 Cal.App.4th at p. 400.) Finding that the attorney committed battery, the trial court granted an injunction under section 527.6, even though the attorneys advised the court at a hearing on the restraining order that "they do not 'regularly do business with [each other] or oppos[e] each other.' " (*Ibid*.)

Reversing the trial court, the Court of Appeal ruled the trial court "misinterpreted section 527.6 in concluding an injunction must issue based on a single incident of battery without finding a threat of future harm." (*Russell*, *supra*, 112 Cal.App.4th at p. 401.) Relying on *Scripps*, the court reasoned

14

that "an injunction serves to prevent future injury and is not applicable to wrongs that have been completed. An injunction is authorized only when it appears that wrongful acts are likely to recur." (*Id*. at p. 402.) The Court of Appeal further explained that "[w]hen the court concluded that a single act of unlawful violence required the issuance of an injunction, it construed its role too narrowly. There may well be cases in which the circumstances surrounding a single act of violence may support a conclusion that future harm is highly probable. That finding, however, must be made and the court failed to do so here." (*Id*. at p. 404.)

Finally, in *Harris*, the Court of Appeal affirmed the issuance of a restraining order pursuant to section 527.6 against a parent who had threatened the principal at his son's school. (*Harris, supra*, 248 Cal.App.4th at pp. 497–503.) Quoting *Scripps*, the court stated that the " 'determination of whether it is reasonably probable an unlawful act will be repeated in the future rests upon the nature of the unlawful violent act evaluated in the light of the relevant surrounding circumstances of its commission and whether precipitating circumstances continue to exist so as to establish the likelihood of future harm.' " (*Id*. at pp. 499–500.)

In concluding sufficient evidence supported the trial court's implied finding that there was a likelihood of future harm, the court noted the parent was a school board member and was usually the one to pick up his son from school. (*Harris, supra*, 248 Cal.App.4th at p. 501.) It also cited testimony that, in addition to threatening the principal, the parent had displayed "aggressive and disrespectful behavior towards various witnesses," including a school police officer and security officer;

15

the parent had attempted to move toward the principal during a tense exchange, requiring the school police officer to move between them; and that, after threatening the principal, the parent defied the principal's directive not to come onto the school campus.  (*Ibid*.)

**B.** **The evidence does not compel the conclusion that harassment is likely to recur[7]**

According to Saks, substantial evidence does not support the trial court's findings that a restraining order was unwarranted "[g]iven the lack of past interaction" between him and Landi and the "one time" nature of the parking structure incident.  We understand both findings to support the trial court's implicit conclusion that Saks failed to show "that harassment is likely to recur in the future." (*Harris, supra,* 248 Cal.App.4th at p. 499.)  Indeed, Saks argues the trial court erred because the "uncontroverted evidence presented to the trial court demonstrated a high probability of future harm."

We disagree.  As described below, Saks relies on a one-sided version of the evidence that fails to account for the facts and inferences contradicting his argument.  That approach is at odds with our role in reviewing the trial court's findings for substantial evidence.  (See *Schmidt v. Superior Court, supra,* 44 Cal.App.5th at p. 581 [court applying substantial evidence review

---

**7** Landi filed a motion with this court for leave to present new evidence regarding events occurring after the restraining order hearing.  Landi contends the new evidence, which he cited in his brief, supports the conclusion that harassment is not likely to recur.  We denied that motion on August 22, 2022, and thus we do not rely on the new evidence submitted by Landi.

16

"completely disregard[s]" evidence contrary to the trial court's order, "draw[s] all reasonable inferences to affirm the trial court," and "do[es] not reweigh the evidence"].)

For example, Saks first focuses on Landi's testimony that the parking structure incident was a "culminating event" based on their interaction in the elevator a few weeks earlier, Landi's belief that Saks antagonized contractors in the building, and complaints about Saks from Landi's wife. Saks argues this testimony confirms that there were "numerous past interactions" between him and Landi, contrary to the trial court's finding of a "lack of past interaction." Saks further argues that Landi's testimony proves the parking structure incident was not a "one time" event.

Saks's argument ignores that in the six years he and Landi owned units in the building before the parking structure incident, these were the *only* "interactions" Landi cited in describing the reason he struck Saks, other than that Saks parked in his space. Two of these three "interactions" did not even involve face-to-face contact between them. Furthermore, Saks and Landi each testified that prior to the incident they generally avoided one another. Given this paucity of interaction, substantial evidence supported the trial court's finding that there was a "lack of past interaction" between Saks and Landi.

Saks's argument also ignores that there were no violent incidents between him and Landi either before or after the parking structure incident.[8] Substantial evidence thus supported

---

[8]  Saks argues that in addition to the parking structure incident, Landi tried to run into him with Landi's bike several months prior to the hearing. However, Landi denied that

the trial court's finding that the parking structure incident was a "one time" event.

Next, Saks argues the threat of future harm is demonstrated by Landi's failure to apologize for the incident or testify that an attack would not happen again. Again, Saks ignores that Landi testified he was sorry for his conduct and that he agreed he had lost his control, factors the trial court was entitled to weigh in examining the likelihood of future harm. (See *Scripps, supra,* 72 Cal.App.4th at p. 335, fn. 9 ["the determination of whether it is reasonably probable an unlawful act will be repeated in the future rests upon the nature of the unlawful violent act evaluated in the light of the relevant surrounding circumstances of its commission"].)

Saks also points to the pending lawsuits involving Saks, Landi, and the homeowners association. He argues those lawsuits were at the "core" of the parking structure incident, and that as those lawsuits continue so too will the interactions between him and Landi. While those lawsuits may require them to interact in the future, the possibility of future interaction between them does not compel the conclusion that harassment is likely to recur. That is especially so given Landi's testimony that the pending litigation was not a source of stress. Landi was not even aware Saks had provided deposition testimony in the litigation the day before the incident.[9]

accusation and we "resolve all factual conflicts and questions of credibility in favor of the prevailing party." (*Harris, supra,* 248 Cal.App.4th at p. 499.)

[9] Saks highlights his testimony that as he and Landi exited the parking structure, Landi allegedly shouted that "he was sick

18

Saks raises a similar argument regarding the ongoing repairs at the condominium complex, contending "[c]ontractors will continue to be present at the [c]omplex and within the [u]nit which Landi had testified gave rise to the first attack." Even if Landi believed Saks had antagonized contractors in the past, Saks fails to explain how the continued presence of contractors at the building compels the conclusion that further incidents of harassment are likely to recur. In fact, Saks had not even seen Landi on the five or six occasions he visited the building following the incident.

Saks challenges several more aspects of the trial court's findings. He argues the trial court found that Saks "was trying to stay away from the building" after the parking structure incident and contends that this should "not bear in Landi's favor." He similarly argues the trial court should not have credited Landi for calling the police after the incident.

Regarding the first issue, the trial court's decision did not find that Saks was "trying to stay away from the building;" it found that Saks did "not stay at the building currently," implying that Saks did not reside there. That was true before the incident too. In any event, it was reasonable for the trial court to infer

---

of the fucking lawsuit." Although Landi did not deny making this specific statement, he denied yelling at Saks as they exited the parking structure. The trial court's decision did not address this factual issue, but concluded that there was no "credible evidence of . . . any abuse that occurred after the incident." Even assuming the trial court credited Saks's testimony regarding Landi's statement, we find that substantial evidence supported the trial court's conclusion that harassment was not likely to recur.

that Saks's infrequent visits to the building after the incident reduced the likelihood that harassment would recur. Concerning the second issue, it was likewise reasonable for the trial court to infer from Landi's prompt call to the police after the incident—resulting in his own arrest—that Landi was unlikely to engage in harassment in the future.

Finally, Saks notes that Landi's private elevator was not in service at the time of the hearing and faults the trial court for failing to recognize that when it observed in its decision that Landi "has his own dedicated elevator in and out of his unit at the building." We find no error. It was reasonable for the trial court to infer that Landi's private elevator would reduce the likelihood that he and Saks would interact in the building. And even if Landi's private elevator was out of service at the time of the hearing, Saks fails to explain why we should infer it would remain out of service indefinitely. (*Harris*, *supra*, 248 Cal.App.4th at p. 499 [appellate court "indulge[s] all legitimate and reasonable inferences to uphold the finding of the trial court if it is supported by substantial evidence"].)

In sum, we conclude that substantial evidence supported the trial court's implicit conclusion that Saks failed to prove that harassment was likely to recur.

## C. The trial court did not misapply section 527.6 or applicable caselaw

Saks raises several unpersuasive arguments in support of his claim that the trial court misapplied section 527.6 and the caselaw construing it.

Saks notes that at the start of the hearing the trial court stated to the parties, "And I guess the question that I have is isn't this just one day, so what's my course of conduct?" The trial

20

court then directed the parties to consider *Leydon v. Alexander* (1989) 212 Cal.App.3d 1 (*Leydon*), where the Court of Appeal, applying a former version of section 527.6, reversed the issuance of a restraining order based on a single incident of abusive conduct.

Prior to the second day of the hearing, Saks filed a brief with the trial court clarifying that *Leydon* concerned a former version of section 527.6 that defined "harassment" as a "knowing and willful course of conduct" (*Leydon*, *supra*, 212 Cal.App.3d at p. 4; see Stats. 1987, ch. 1493, § 1), and that section 527.6 had since been amended to broaden the definition of "harassment" to also include "unlawful violence" and "a credible threat of violence" (§ 527.6, subd. (b)(3)). Saks's brief further stated that, as emphasized in *Russell*, "a single act of unlawful violence is sufficient for the issuance of an injunction, and, without more, may alone [form] the basis to conclude that future harm is possible."

On the second day of the hearing, the court stated that it had received Saks's brief and that it "would generally agree that [Saks's counsel] has accurately stated the state of the law with respect to the issue, and then it just becomes a factual context." Despite that, Saks now argues that "it is clear that the trial court never moved off of its belief that 'one time' incidents cannot result in the issuance of a [civil harassment restraining order]."

We disagree. As recounted above, the trial court agreed that Saks's brief, which explained that a single incident of unlawful violence could be the basis for a restraining order under section 527.6 where there was also a likelihood of future harm, had "accurately stated the state of the law."

21

Moreover, the trial court's decision does not cite or rely on *Leydon*. Nor does it suggest that Saks was required to prove a "course of conduct" to establish "harassment" under section 527.6. Rather, just as Saks urged in his brief to the trial court, and in accordance with *Russell*, the trial court's decision states that "a single act of 'unlawful violence' may be sufficient to support" a civil harassment restraining order, so long as the trial court finds a "reasonable probability of future harm absent an injunction." (See *Russell*, *supra*, 112 Cal.App.4th at p. 404.)

Saks also argues that *Scripps* and *Russell* incorrectly construed section 527.6 by requiring a plaintiff to show harassment is likely to recur in the future. According to Saks, section 527.6 reflects the Legislature's decision "that one who is the subject of an assault and battery, as defined in the statute, as a matter of law, was entitled to protection in the future."

As an initial matter, Saks appears to have forfeited this argument by failing to raise it to the trial court. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221 ["A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court"].) As best we can tell, Saks asked the trial court to follow *Scripps* and *Russell*, not depart from them. His argument thus also falters pursuant to the doctrine of invited error, which "is applicable to a situation where a party invites the court to rule against it on a particular issue, and then challenges the merits of that ruling on appeal." (*Diaz v. Professional Community Management, Inc.* (2017) 16 Cal.App.5th 1190, 1204.)

In addition to these procedural reasons for rejecting Saks's argument, we see no reason to disagree with *Scripps* and *Russell* that a plaintiff seeking a restraining order under section 527.6

must demonstrate that harassment is likely to recur in the future. That conclusion follows sensibly from the principle explained in *Scripps* that "injunctive relief lies only to prevent threatened injury and has no application to wrongs that have been completed." (*Scripps*, *supra*, 72 Cal.App.4th at p. 332; see also *Russell, supra*, 112 Cal.App.4th at p. 402 [rejecting trial court's understanding that section 527.6 calls "for the issuance of an injunction upon the finding of a single act of past violence," an interpretation "too narrow in view of the purpose of a prohibitory injunction"].)

Furthermore, and tellingly, Saks fails to cite any authority calling *Scripps* or *Russell* into question. Instead, he argues that a restraining order is "qualitatively different" from an injunction based on the observation in *Byers v. Cathcart* (1997) 57 Cal.App.4th 805 (*Byers*), that section 527.6 "is a specialized statute providing an expedited procedure for issuance of *limited-scope* and *limited-duration injunctions* in instances of 'harassment.' " (*Byers*, at p. 807.) But that observation hardly suggests that *Scripps* and *Russell* incorrectly determined that because a restraining order under section 527.6 was injunctive relief, a plaintiff must show that harassment is likely to recur.

Saks also draws our attention to the statement in *Byers* that the "statute is limited to protecting only those who have suffered" harassment as defined in the statute. (*Byers*, *supra*, 57 Cal.App.4th at p. 811.) According to Saks, this statement suggests "this limited purpose injunction may also be issued for past acts." We are not convinced. Because *Byers* did not consider the issue addressed in *Scripps* or *Russell*, namely, whether a single act of "unlawful violence" may justify a restraining order without evidence that such harm was likely to recur, the passage

23

from *Byers* that Saks relies on cannot bear the weight he places on it.[10]  (See *People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10 ["It is axiomatic that cases are not authority for propositions not considered."].)

Saks further argues the trial court erred because this case is more like *Harris*, which affirmed the issuance of a restraining order, than *Scripps* or *Russell*, which reversed the issuance of restraining orders.  He argues that the victims of harassment in *Scripps* and *Russell* did not suffer serious injury like he did; that the incidents at issue in those cases were "spontaneous," unlike here, where the parking structure incident was the culmination of conflict between him and Landi;[11] that unlike the defendants in those cases, here Landi gave "demonstrably false" evidence about the nature of the incident; and that unlike in those cases,

---

[10]     *Byers* addressed whether a trial court properly issued an injunction under section 527.6 that prevented the plaintiff, who had an easement to use the defendant's driveway, from parking her car along the driveway.  (*Byers*, *supra*, 57 Cal.App.4th at pp. 807–810.)  The court concluded that the trial court erred because there was no evidence that plaintiff had engaged in "harassment" within the meaning of section 527.6 by parking her car along the defendant's driveway.  (*Byers*, at p. 812.)

[11]     In his effort to distinguish this case from *Scripps* and *Russell*, Saks suggests that Landi "waged a campaign of destruction upon his property."  While we acknowledge Saks provided brief testimony that Landi had prevented certain repairs from being performed on Saks's property, we think such testimony fell short of demonstrating "a campaign of destruction."  Saks also highlights his belief that Landi's conduct towards him was attributable to Landi's "perceived homophobia." We find no support in the record for Saks's belief.

he and Landi owned units in the same building and continue to be litigation adversaries. Saks further argues that this case is like *Harris*, because there was a history of tension between Saks and Landi and "there is no doubt that future interactions" between them will occur.

We are not persuaded that differences between this case and *Russell* and *Scripps*, or similarities between this case and *Harris*, compel the conclusion that the trial court abused its discretion in declining to issue a restraining order. The trial court observed the testimony of Saks and Landi, evaluated their credibility, and carefully weighed the evidence in concluding that Saks failed to establish harassment was likely to recur. (See *Russell, supra*, 112 Cal.App.4th at p. 404; *Scripps, supra*, 72 Cal.App.4th at p. 336.) It is not our role to reweigh that evidence or reevaluate witness credibility. (*Schmidt v. Superior Court, supra*, 44 Cal.App.5th at pp. 581–582 [under substantial evidence review appellate court does "not reweigh the evidence" and credibility determinations "are subject to extremely deferential review"]; *Harris, supra*, 248 Cal.App.4th at p. 499 ["We resolve all factual conflicts and questions of credibility in favor of the prevailing party"].) And as we have described already, substantial evidence supported the trial court's conclusion that Saks failed to establish that harassment was likely to recur.

## D. The trial court did not err by relying on excluded evidence

Saks contends the trial court committed reversible error by relying on evidence that was excluded from the record.

We briefly recount the background relevant to Saks's argument. In Landi's response to Saks's restraining order request, Landi claimed that Saks had "a history of abusing the

25

legal system" and stated that Saks had "been the plaintiff or defendant in at least 17 different litigation matters in the last 20 years." Landi's response also included five declarations from other residents in the condominium complex accusing Saks of being litigious.

At the start of the hearing, the trial court stated it would "admit the admissible portion of [Landi's] response into evidence," but that it "would not necessarily take in the third-party declaration[s]."

Later at the hearing, during a discussion regarding the admissibility of Saks's video evidence, Saks's counsel emphasized that there was a "long course of events" that led Landi to strike Saks, including "multiple lawsuits pending, in which these are parties." Shortly after, the trial court noted to Saks's counsel that "your guy is litigious, apparently, and I have got declarations." Saks's counsel promptly objected. As noted already, because none of the witnesses who had provided the declarations testified at the hearing, none of the declarations were admitted in evidence.

On the second day of the hearing, during a discussion regarding the relevance of a cross-examination question concerning whether Saks had considered filing a civil lawsuit against Landi based on the incident, the trial court made the following statement: "I need to be careful about something. I did say before, in a question, something to the effect of I thought you had suggested in your paperwork that [Saks] was litigious and then there was the response back, I think I have the issues squarely at hand, and I wouldn't be relying on or considering those issues. I don't think they are necessary under the circumstances."

Saks contends the trial court's statement to his counsel that "your guy is litigious" constitutes reversible error. According to Saks, it demonstrates the trial court relied on the claim in Landi's response that Saks had "been the plaintiff or defendant in at least 17 different litigation matters in the last 20 years," even though no such evidence had been admitted at the hearing. Saks likewise contends that the trial court's statement shows that it considered the declarations attached to Landi's response, even though the court excluded them from evidence.

We are not persuaded.[12] We presume the court " 'is able to distinguish admissible from inadmissible evidence, relevant from irrelevant facts, and to recognize those facts which properly may

---

[12] We are also unpersuaded by Saks's argument that the trial court erred by making the following comments during the hearing: "Well, look, let's get back to the questioning. Mr. Fisher, I think what I would caution, though, is I am still concerned when you live in a condo and you are a real estate broker and you park in someone else's spot when you are in the middle of a lawsuit with them. Look, I am not condoning what happened, but I am saying it is one of the factors, and when your guy says 'just chill out' in the middle of litigation, and he is parked in the guy's spot when he has his own spot, why would he park in the guys' spot?"

According to Saks, the trial court's "shocking focus on the evidence was just plain wrong and for the trial court to employ the phrase 'just chill out' as a factor against [Saks] is neither substantial evidence supporting its decision nor a basis upon which the trial court should have denied the injunction." We find no reversible error. As we have explained already, the trial court's ruling is supported by substantial evidence and is based on a correct application of section 527.6.

27

be considered in the judicial decisionmaking process.' [Citation.] Stated another way, a trial court is presumed to ignore material it knows is incompetent, irrelevant, or inadmissible. [Citations.] So, if the court states it will ignore evidence, it will be presumed that it did so. [Citations.]" (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1526.)

Here, the trial court stated on the record that it would not rely on or consider Landi's unsupported claim that Saks was litigious, and no part of the trial court's decision suggests otherwise. We therefore presume the trial court considered only admissible evidence in issuing its decision. (See *In re Marriage of Davenport*, *supra*, 194 Cal.App.4th at p. 1526.)

## DISPOSITION

The court's order denying Saks's motion for a restraining order pursuant to section 527.6 is affirmed. Saks's request for judicial notice is denied. Landi is entitled to his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

RICHARDSON (ANNE K.), J.*

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

29