Filed 11/30/23  Williams v. Hefflin CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOSH WILLIAMS, | D082235 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. CVSW2201048) |
| JAMES HEFFLIN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Riverside, Joni Sinclair, Commissioner.  Reversed.

The Law Offices of John D. Gallegos and John D. Gallegos for Defendant and Appellant.

Josh Williams, in pro. per., for Plaintiff and Respondent.

James Hefflin appeals a Code of Civil Procedure[1] section 527.6 civil harassment restraining order prohibiting him from contacting Josh and

---

[1]     Undesignated statutory references are to the Code of Civil Procedure.

Tamara Williams,[2] a married couple, and their two grandchildren. Hefflin contends: (1) the order was not supported by sufficient evidence of an ongoing course of conduct or of substantial emotional distress; (2) a letter his daughter's attorney sent to the Williams family was protected by the litigation privilege; and (3) the court abused its discretion by not granting his anti-SLAPP motion (§ 425.16)[3] based on that protected communication. Finding merit in Hefflin's arguments, we reverse the order.

FACTUAL AND PROCEDURAL BACKGROUND

The Williamses and Hefflin were neighbors until the end of 2020. On February 14, 2022, Josh filed a request for a temporary restraining order against Hefflin, seeking protection for himself, his wife and two grandchildren. He alleged Hefflin "was constantly showing up unannounced more than the norm and almost demanding to make plans over us and our grandchildren. Constantly, Mr. Hefflin made it seem that he has intitlement [*sic*] to our grandchildren, and has threatened to take them, even telling them he will adopt them if we do not. Mr. Hefflin even pressured us to move to adoption with an attorney of his choice[.] . . . Mr. Hefflin continues to threaten us with court and taking our grandchildren." (Some capitalization omitted.) Josh sought stay-away orders and "anything else that rationally applies. We want to be safe, free and clear of Mr. Hefflin and family." (Some capitalization omitted.) Josh claimed he had a "fear of contact and retaliation from Hefflin." (Some capitalization omitted.)

---

[2]    We refer to the Williamses by their first names to avoid confusion, and intend no disrespect.

[3]    " 'SLAPP' is an acronym for 'strategic lawsuit against public participation.' " (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 413, fn. 2.)

Josh stated in the petition that he and his family were "mentally and emotionally, constantly stressed," and they were harassed "daily in some way shape or form via phone, messaging of adults as well as the grandchildren, and via social media with the kids, always asking for our location, and then [Hefflin] would show up out of the blue and say he was in the area." (Some capitalization omitted.)

Josh additionally requested the court prohibit Hefflin from contacting them "through lawyers with made[-]up accussations, [*sic*] a year and a half later" (capitalization omitted). That was an apparent reference to a February 12, 2022 letter that an attorney representing Hefflin's teenage minor daughter wrote to Josh and Tamara.[4]

---

[4] The attorney, who also represented Hefflin below and now on appeal, wrote to the Williamses that Hefflin's family "shared in a parenting relationship with" the Williamses' grandchildren. The attorney stated the Williamses were appointed permanent custodians of the grandchildren by a Kansas juvenile court, and the grandchildren are now wards of California and subject to its laws. The attorney wrote: "It has come to my attention that you have fallen below these [best interest of the child] standards at least during the period of January 2019 to date." The attorney specified the Williamses' alleged failures in raising their grandchildren: (1) the Williamses were failing "to provide medical and psychological care to the [grandchildren], both of whom are mentally and emotionally disabled from being abused while in the care of the mother"; (2) Josh "was accused of . . . abusing [the grandchildren] while in [his] care"; (3) Josh "allegedly threatened to send the [grandson] back to Kansas where he would end up back in foster care after the reporting occurred . . . [and] allegedly threatened the [grandson] with bodily injury if he were to continue to report" the abuse; (4) Josh "allegedly discriminated against the [grandson] based upon his African[-]American heritage by making inappropriate statements to him on this basis"; and (5) Josh "allegedly used the [grandchildren] as conduits to direct [his] retaliation toward [Hefflin's daughter]." The attorney added, "After separating my client and her family from the [grandchildren,] you thereafter alienated them and poisoned the well by making disparaging remarks about the Hefflin's [*sic*]."

Hefflin responded to the petition, stating in a March 2022 declaration that he and his family "provided foster care for the [Williamses grandchildren] . . . . During the time period as a foster care parent and subsequent to that, my family was aware of neglect and abuse by [Josh] toward his grandchildren." Hefflin stated: "At some point in time, [Josh] was named as the [g]uardian in Kansas for his grandchildren but never filed any paperwork in California for said children, which he is required to do. Recently my daughter received a threatening social media post from [Josh's] grandchild. This prompted [her] to write a letter . . . through counsel, regarding the concerns she had with [Josh] as it was believed that he prompted the threatening e[-]mail to my daughter through his grandson."

---

The attorney wrote that the Hefflins "cared for the [grandchildren] because [the Williamses] were unwilling or unable to. This included having them live at [the Hefflins'] home, feed them, purchase clothes, take them to church, take them on family vacations, help them with schoolwork, take and pay for their mental healthcare, meet with school officials to prevent bullying, and set up educational accommodations so that [the grandson] could remain in school. Additionally, the Hefflin's [*sic*] took [the grandson] to guitar lessons, gymnastics, and taught him basic carpentry skills."

The attorney wrote: "My client has and remains damaged by your conduct and will seek compensation accordingly. One potential consequence of your actions may be a petition to remove you as guardians of [the grandchildren] and have them joined in a suit against you for damages as well. At a minimum we will seek and obtain court[-]appointed counsel for the [grandchildren] to monitor their care and see if they need temporary placement. [¶] We are requesting that you participate in reunification therapy. We further request that you cease and desist from using either of the [grandchildren] as conduits to put out false information about [the Hefflins] electronically, verbally, or by publication. Moreover, any false and disparaging information about [the Hefflins] will be subject to a potential defamation and slander claim. [¶] Within the next 10 days, we require confirmation of the aforementioned reunification therapy, the defamation issues, and accountability for the abuse. If we do not receive confirmation of same, we will have no choice but to proceed with court intervention."

4

Hefflin claimed the Williamses filed the restraining order petition the day after his daughter's attorney e-mailed the letter to them, and therefore it "is a blatant attempt to silence my family regarding the conditions of the [Williamses' grandchildren]. Moreover, I have had no contact with the [Williams] family since we moved from the Menifee area after we sold our house in February of 2021 and moved to Palm Desert, California." Hefflin stated the petition is "moot." Hefflin also reasoned insufficient evidence supported the claim Josh suffered emotional injury, or that there was a likelihood of future injury. He argued the petition sought to enjoin protected activity and free speech, and it was improper under the anti-SLAPP statute.

The court denied the petition for a temporary restraining order until after holding a hearing.

*Tamara's Testimony*

At the March 2022 hearing on the petition, Tamara testified regarding her concerns about Hefflin: "[W]e're here because we are very worried about our grandchildren. Mr. Hefflin has no family ties to us at all. He was a neighbor. He was a friend. He continuously asks [*sic*] to see the kids before he moved. And we would tell him no towards the end. And he would get upset with us and start threatening us." Tamara stated that after Hefflin moved, they did not "have contact with him until recently. [¶] But knowing Mr. Hefflin, once he started the communication again, he continues it. So we called the police department as soon as we got this last demand letter from his attorney . . . and they advised us to get a restraining order. We also had counsel with a lawyer who also said we should get a restraining order because of his past harassment." Tamara added, "The main thing in that demand letter, it said we're going to take you to court and get reunification

5

with the children.  That's what scares us, because we don't want Mr. Hefflin to have anything to do with the grandchildren."

Tamara stated the grandchildren were 15 and 13 years old respectively at the time of the proceeding.  She stated, "I think the court needs to understand that Mr. Hefflin went above and beyond a lot of things when it came to the kids.  He overstepped boundaries."  She elaborated, "He bought them cell phones without our permission and gave them to them.  And then used them to contact the kids without us knowing a lot of the time, things like that."  Tamara explained that "during the last part of the relationship, we noticed from the mid-part of it to the end of it, the kids were filming us and taking pictures of where we were at—say at [stores], or some other location.  And [Hefflin] would show up out of the blue and be, like, 'What a coincidence.  Here I am.' "

Tamara testified:  "[Hefflin] used the cell phones as a tool against us because he would give them to [the grandchildren] when they were at his house.  They knew they weren't allowed to have cell phones at our house.  So when [the grandchildren] came home, they would be upset because they didn't have a cell phone.  [Hefflin] would say it's a safety issue.  So he convinced us it's a safety issue.  So when we finally let the kids have cell phones, he would use the cell phones to control them."  She testified that Hefflin would tell the grandchildren, "If you guys don't come over, I'm going to turn your cell phone off."  Tamara stated Hefflin "had the ability to turn off their service using his phone."  Tamara said this conduct continued for approximately a year and a half.

The court asked Tamara if Hefflin still had contact with the grandchildren.  She did not point to any recent interaction with Hefflin; rather, she replied:  "He knows their phone numbers, and he knows their e-

mails.  He used to stalk our grandson . . . on social media.  At one point, he had one of his family members—he says was a family member, I believe it was Mr. Hefflin—disguise themselves as a teenage girl to get into contact with our grandson.  And then [Hefflin] told us about it afterwards."

Tamara showed the court some documents for its in camera review. She described some of them as being letters from the grandchildren, and others as e-mails showing Hefflin was "going to request visitation [and] has a right to do so[.]"

*Josh's Testimony*

Josh explained the evolution of his family's relationship with Hefflin: "As time went on, we noticed—and it was pointed out to us by friends and family, as well as neighbors, saying they notice things or heard things in our discussions that they thought were not right, that were out of place.  They even said things like they thought [Hefflin] was grooming us and our grandkids and our family.  [¶]  We started to shorten up our relationship. And then Mr. Hefflin shows opposing attitude towards it, that he did not like that we were ending the relationship.  We were kicking him to the curb, so to speak.  I advised him through text messages and stuff that we weren't doing that.  We just wanted to break it off and move on with our lives.  We didn't want to continue with the relationship.  [¶]  The grandkids weren't happy with it at this point.  We weren't happy with it, based on instances over the last period of the relationship that we felt was weird, disturbing, upsetting, stressful.  We felt threatened.  [¶]  As we moved to the point where we were like, [']please leave us alone,['] we called the Menifee Police Department and asked them to go—if they would speak with him and have him leave us alone. Quit texting us.  Don't try to communicate with us.  We just wanted to end it."

Josh also explained that someone had called Child Protective Services (CPS) about them and, as a result, CPS agents visited their home "and discussed with my grandson—away from us—and discussed with me and [Tamara] in the presence [*sic*] in the house with the kids. They went through the home, discussed the issue with us, found no fault, no problems, and no issues with anything. [¶] The sheriff then came after that and evaluated and did the same thing with the home and the kids and everything, and asked the kids questions separately. There was no problem there at that point in time."

Josh testified he regarded the attorney's letter as a threat: "The reason we're filing the restraining order has nothing to do with anything or his letter or what he says in the letter. It's because [Hefflin is] sending us another piece of information. We take it as a threat because he's presenting himself that he can send a letter to us, or a document to us, and do what he wants with us at any given time."

*Hefflin's Counterargument*

Hefflin did not testify at the hearing. But his attorney referred to Hefflin's declaration, which the court acknowledged reading. The attorney raised the anti-SLAPP issue, arguing his letter to the Williamses related to "protected activities. And the restraining order was simply brought because these issues were raised, and [the Williamses] don't want to deal with CPS. . . . Mr. Hefflin has had no contact with them for, at minimum, a year. So it's clearly in response to a letter, a legal letter regarding protected activity . . . . And that can't constitute harassment, especially when it didn't come from Mr. Hefflin." The court interjected, "The letter by itself may not constitute harassment."

The court asked Hefflin's counsel, "[Hefflin] hadn't seen [the grandchildren] for a year and a half . . . . He doesn't know what's going on

8

with them," adding, "What is Mr. Hefflin's concern about these children that are not his or in his custody?" Counsel replied, "[Hefflin] knows from contact with the courts in Kansas that they're not in the system here in California. And he's concerned about the children, as far as them acting out towards his daughter, whether it be through the child or whether it be through [Josh]. So he does have concerns about the well-being of his children as well as the [Williamses' grandchildren]."

*The Court's Ruling*

In granting the protective order, the court told Hefflin: "I don't think you have custody of the children. If you have concerns about their care, CPS is the proper agency or any other agency. Sending letters through your lawyer that are threatening—you've been gone for a year. I don't know[.]" Under the protective order, Hefflin is not to harass, intimidate, molest, attack, strike, threaten, assault, hit, abuse, disturb personal property, disturb the peace of the protected individuals. He must not contact them directly, indirectly, or in any way, including by person, telephone, by public or private mail, by e-mail, by text messages, or faxes, or any other electronic means. Hefflin also must stay 100 yards away from the grandparents and the grandchildren. The order expires in 2027.

## DISCUSSION

Hefflin raises various issues, as stated above, but we need only address his meritorious contentions that the letter his daughter's attorney sent to the Williamses was protected communication; therefore, the court improperly relied on it in issuing the restraining order. Moreover, there was no instance of existing harassment by Hefflin based on non-protected conduct to support issuing the restraining order.

9

A. *Applicable Law*

Section 527.6, subdivision (a)(1), provides, "A person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order and an order after hearing prohibiting harassment as provided in this section." Subdivision (b)(3) of section 527.6 defines harassment as not just unlawful violence, or a credible threat of violence, but also "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose."

The statute defines a " '[c]ourse of conduct' as a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means." (§ 527.6, subd. (b)(1).) "The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (§ 527.6, subd. (b)(3).) "Constitutionally protected activity is not included within the meaning of 'course of conduct.' " (§ 527.6, subd. (b)(1).)

At the hearing on a petition for a civil harassment restraining order, the court "shall receive any testimony that is relevant, and may make an independent inquiry." (§ 527.6, subd. (i).) The trial court may issue a restraining order only after finding "by clear and convincing evidence" that unlawful harassment exists. (*Ibid.*)

"[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of

10

high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) "Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at p. 996.)

"[W]hether the facts, when construed most favorably in [petitioner's] favor, are legally sufficient to constitute civil harassment under section 527.6, and whether the restraining order passes constitutional muster, are questions of law subject to de novo review." (*R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188; accord, *Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 497.)

This court's precedent governs this case. We have held that protective orders apply prospectively only: "[T]he express codified purpose of a prohibitory injunction is to prevent future harm to the applicant by ordering the defendant to refrain from doing a particular act. [Citations.] Consequently, injunctive relief lies only to prevent threatened injury and has no application to wrongs that have been completed. [Citation.] It should neither serve as punishment for past acts, nor be exercised in the absence of any evidence establishing the reasonable probability the acts will be repeated in the future. Indeed, a change in circumstances at the time of the hearing, rendering injunctive relief moot or unnecessary, justifies denial of the request. [Citations.] Moreover, not only can injunctive relief be denied where the defendant has voluntarily discontinued the wrongful conduct [citation], there exists no equitable reason for ordering it where the defendant has in good faith discontinued the proscribed conduct [citation]. 'Thus, to authorize

11

the issuance of an injunction, it must appear with reasonable certainty that the wrongful acts will be continued or repeated.' " (*Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 332–333.)

In *Scripps Health,* we concluded the court erred by issuing a permanent injunctive order because the person enjoined (Marin) had changed his behavior, and there was no likelihood of future threats: "The TRO was vacated four days after its issuance based on Marin's express representation he would stay away from Scripps Health facilities pending the evidentiary hearing, leaving him unrestrained during the approximately two months before the evidentiary hearing. During this time, Scripps Health acknowledged Marin's mother again was taken to a Scripps Health facility and remained overnight before being discharged. Marin made no threats of violence or caused any violence while his mother was a patient at the facility. Thereafter, his mother transferred her health insurance to Sharp Healthcare, rendering it unlikely she would have to return as a patient to a Scripps Health facility. Consequently, given the circumstances surrounding this single incident, the evidentiary record does not establish the likelihood Marin would repeat any violent acts against Scripps Health employees. Accordingly, the order granting the permanent injunction must be reversed." (*Scripps Health v. Marin, supra,* 72 Cal.App.4th at p. 336.)

B. *Analysis*

The parties agree, and the court accepted, that at the time of the hearing, Hefflin was no longer the Williamses' neighbor. The hearing testimony established that in the interim since he moved and the time of the instant proceeding, he had not contacted the Williamses for at least one year. Both Josh and Tamara testified that the attorney's letter prompted them to seek the protective order. The court in its ruling specifically admonished

12

Hefflin for "[s]ending letters through your lawyer that are threatening." However, the attorney's letter dealt with his client's claimed grievances with the Williamses' and their grandson relating to cyberbullying and the care of the grandchildren, and ways to redress that. It did not contain any threats of violence, and it was constitutionally protected litigation activity. (See *Hansen v. Volkov* (2023) 96 Cal.App.5th 94, 105 [opposing counsel's e-mails about a canceled deposition were perhaps " 'argumentative and self-serving and entirely unnecessary,' " and "maybe also seriously annoying[; but] they did not contain any threats of violence (credible or otherwise)" and thus were constitutionally protected litigation activity]; *Finton Construction, Inc. v. Bidna & Keys, APLC* (2015) 238 Cal.App.4th 200, 210 [" 'all communicative acts performed by attorneys as part of their representation of a client in a judicial proceeding or other petitioning context are per se protected as petitioning activity by the anti-SLAPP statute' "]; *Cabral v. Martins* (2009) 177 Cal.App.4th 471, 479-480 [same]; see also *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056 [litigation activities, including filing and prosecution of a lawsuit by an attorney representing a client, constitute acts in furtherance of a person's right of petition or free speech]; *Kolar v. Donahue, McIntosh & Hammerton* (2006) 145 Cal.App.4th 1532, 1537 ["anti-SLAPP protection for petitioning activities applies not only to the filing of lawsuits, but extends to conduct that relates to such litigation, including statements made in connection with . . . litigation"].)

We point out the trial court was aware that constitutionally protected activity could not constitute a harassing course of conduct (§ 527.6, subd. (b)(1) ["Constitutionally protected activity is not included within the meaning of 'course of conduct' "]), as it told Hefflin's counsel at the hearing that the attorney's letter "by itself may not constitute harassment." Nevertheless, the

13

court did not point to any other nonprotected conduct to support its issuance of the protective order.  The court erred in considering the attorney's letter as part of Hefflin's course of conduct of harassment.  (§ 527.6, subd. (b)(1); see *Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 663 [even if petitioner had been seriously alarmed, annoyed or harassed by respondent's conduct—a public demonstration at petitioner's church protesting petitioner's eviction of respondent—there was no showing that respondent's injurious actions were part of a "course of conduct" within the meaning of section 527.6 because the conduct constituted a form of protected speech].)

As the record does not show any recent incident of threat or harassment by Hefflin towards the Williamses to support the issuance of the protective order, the only reasonable conclusion is that the court relied on Hefflin's past conduct to support the protective order.  But that was an impermissible basis for the protective order under this court's precedent as set forth above.  Even if the court believed Hefflin had, in the past, improperly inserted himself into the Williamses' relations with their grandchildren, and caused them severe detriment, such conduct by Hefflin had stopped for at least one year.  Further, he had moved to a different city, and he had refrained from any new incidents.  Under the law, "the course of conduct must be ongoing at the time the injunction is sought." (*Scripps Health v. Marin, supra,* 72 Cal.App.4th at p. 333; § 527.6, subd. (i) [the court must find "unlawful harassment exists"].)  Further, as stated, a protective order should not punish past acts, nor be exercised in the absence of any evidence establishing the reasonable probability the acts will be repeated in the future.  (*Scripps Health,* at p. 332; accord, *Russell v. Douvan* (2003) 112 Cal.App.4th 399, 401, 403.)

14

DISPOSITION

The order is reversed.  Each party shall bear its own costs on appeal.


O'ROURKE, Acting P. J.

WE CONCUR:


IRION, J.


CASTILLO, J.